# United States District Court
## DISTRICT OF CONNECTICUT

FILED

Nov 17  3 00 PM '03

U.S. DISTRICT COURT
NEW HAVEN, CONN.

|  |  |  |
|---|---|---|
| MARCUS H. DIGGS, | : | |
| **_Plaintiff_** | : | No: 3:02CV1628 (GLC) |
| | : | |
| V. | : | |
| | : | |
| | : | |
| TOWN OF MANCHESTER | : | |
| STEVEN WERBNER (Deputy General Manager); | : | |
| THOMAS WEBER (Fire Chief) ; | : | |
| ROBERT BYCHOLSKI (Assistant Fire Chief) | : | |
| IN THEIR INDIVIDUAL AND OFFICIAL | : | |
| CAPACITY AND | : | |
| LOCAL 1579 IAFF | : | |
| DAVID M. MAYER (President) | : | |
| **_Defendants_** | : | NOVEMBER 12,2003 |
| | : | |

## PLAINTIFF'S LOCAL RULE 56(a)2 STATEMENT OF UNDISPUTED FACTS

1. Admit.

2. Admit.

3. Admit.

4. Admit in part, deny in part.  There were many incidents where Plaintiff was disciplined and written up by the Defendants with no representation from any officer or representative of IAFF, Local 1579.  Plaintiff's personnel file is filled with "Memos to File" from Chief Rivosa, Deputy Chief Bycholski and Chief

1

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800 (O)  (203) 368-6985 (Fax)
cynthia.jennings@sbcglobal.net

Beckwith which the Defendant's use as evidence.  (See Exhibit 1)  On August 25,

1988 Robert Martin, the Union President was not even aware that Plaintiff had

filed a grievance against the Town of Manchester.  (See Exhibit 2).

5.  Admit.

6.  Admit.

7.  Admit.

8.  Admit.

9.  Admit.

10. Admit.

11. Admit.

12. Admit.

13. Admit.

14. Admit in part, deny in part.    Plaintiff was written up for missing call number

801321, however, this was due to a malfunctioning radio.  Deputy Chief

Beckwith and other members stationed at headquarters affirmed that said radio

(Portable #4) was not working, therefore, calls could not be heard. (See Plaintiff's

deposition page 68, lines 6-9).

15. Admit.

16. Admit in part, deny in part.  Plaintiff was suspended for two days, however,

Plaintiff filed a grievance for unjust suspension.  Plaintiff was treated differently

than similarly situated white firefighters.  Plaintiff states that he was disciplined

for things similarly situated white firefighters were not. (See Plaintiff's deposition

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800 (O)  (203) 368-6985 (Fax)
cynthia.jennings@sbcglobal.net

page 174 lines 14-20)  On this particular occasion, Plaintiff requested his superior,

Chief Rivosa for intervention regarding this matter all to no avail. (See Plaintiff's

deposition page 70 lines 13-17)  Chief Rivosa stated that Plaintiff should have

been informed that Deputy Chief Beckwith was acting as supervisor in Chief

Rivosa's absence. (See Plaintiff's Exhibit 3)  Plaintiff asked for union

representation. (See Exhibit 4)  Plaintiff was denied union representation for this

incident because he "asked too late" according to Chief Beckwith.  (See Exhibit 4)

The next day, Plaintiff although infirmed received a letter of intent to discipline

from Chief Rivosa stating Chief Beckwith's recommendation for insubordination

and disrespectful behavior. (See Exhibit 5)  Further, profanity was used in

interaction between fellow firefighters, supervisors and officers on a daily basis

(See Plaintiff's deposition page 173 lines 10-19)  In or around the year 1998, Bill

Sweet, a similarly situated white firefighter said, "F--- You" to his supervisor,

Robert Bycholski and no action was taken (See Plaintiff's deposition pages 72-73

lines 1-25 respectively)

17. Admit.

18. Admit.

19. Admit.

20. Admit

21. Admit.

22. Admit.

23. Admit.

3

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800 (O)   (203) 368-6985 (Fax)
cynthia.jennings@sbcglobal.net

24. Admit.

25. Admit.

26. Admit.

27. Admit.

28. Admit

29. Admit.

30. Admit.

31. Admit.

32. Admit.

33. Admit.

34. Admit.

35. Admit.

36. Admit.

37. Admit.

38. Admit.

39. Admit.

40. Admit.

41. Admit

42. Admit in part, deny in part.  While it is true that the meeting started with Deputy

    Fire Chief Bycholski, David Mayer of Local 1579 and Marc Luppacchino, there

    were many instances where Chief Bycholski and David Mayer had "conferences"

    and "discussions" without Plaintiff.  (See Exhibit 6)  David Mayer admits that the

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800 (O)   (203) 368-6985 (Fax)
cynthia.jennings@sbcglobal.net

"last chance agreement" was illegal, and after speaking privately with Chief

Bycholski **still** permitted Plaintiff to sign it. (See Exhibit 6) This was not

protective of Plaintiff's rights. Plaintiff was not notified either by writing or

verbally about the termination meeting that was to take place on November 17,

2000. Local 1579 did not inform him until 3pm the same day. (See Plaintiff's

deposition pages 116, 117). Plaintiff did not agree to the "last chance agreement"

but when he was told that he could not review this document with his lawyer, and

was told that he had to sign it at that meeting or be terminated, Plaintiff, under

duress, in order to save his job, ultimately signed the "Last chance agreement".

(See Exhibit 6) This was done with the understanding from Local 1579 and

David Mayer as his representative that it was a "draft" (See Exhibit 6) and that as

long as David Mayer or any representative from the Union did not sign this "last

chance agreement" the termination would not stand. (See Plaintiff's deposition

pages 118 and 119) Defendant then withdrew "Last chance agreement" and

terminated Plaintiff on November 17, 2000 at approximately 1615 hours. (See

Exhibit 6) Also, the fact that Marc Luppachino was allowed to act as a

representative for Local 1579 on behalf of Plaintiff was an injustice as Marc

Luppachino and Plaintiff used to work as firefighters together and did not have a

good relationship (See Exhibit 7). Union representative David Mayer allowed the

Town of Manchester to terminate Plaintiff although Plaintiff signed the "last

chance agreement." The Union did not sign this agreement in order to protect

Plaintiff's "rights, but did nothing to stop the termination of Plaintiff from

5

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800 (O)   (203) 368-6985 (Fax)
cynthia.jennings@sbcglobal.net

employment with the Town of Manchester as a firefighter, a job which he did for over 10 years. Chief Bycholski used the Town's Violence in the Workplace Policy as a pretext for terminating Plaintiff from his position of firefighter for the Town of Manchester. (See Exhibit 6 and also see Plaintiff's deposition pages 181, 182) The fact that Plaintiff was allowed to return to work the next day (November 17, 2000) after said alleged threats is contradictory. Plaintiff was allowed to work at the same firehouse from a little before 8:30 until 3pm and had pleasant conversation and direct contact with Larry Talbit who in fact was one of the "fearful" firefighters from the previous day. (See Plaintiff's deposition page 116 line 2-15). As for Plaintiff's termination on November 17, 2000 using the Violence in the Workplace Policy, no white firefighter had ever been terminated for the same reason from the Town of Manchester in the past during Plaintiff's employment. (See Plaintiff's deposition page 175 lines 9-16)

43. Deny. Plaintiff was terminated by the Town of Manchester on November 17, 2000. Plaintiff received unemployment compensation. (See Plaintiff's deposition page 186 lines 6,7) Plaintiff was never reinstated in his position as firefighter for the Town of Manchester. His pay was never reinstated following the November 17, 2000 termination. (See Plaintiff's deposition page 186 line 4-5) Plaintiff was never allowed to return to the firehouse. Plaintiff was told that if he returned to the firehouse after November 17, 2000, he would be arrested. (See Exhibit 6 – also see Plaintiff's deposition page 185 lines 16-25) Plaintiff's union grievances pending with the Town of Manchester regarding his November 17, 2000

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800 (O)   (203) 368-6985 (Fax)
cynthia.jennings@sbcglobal.net

termination were denied and absolved without his input or notification. When

Plaintiff attempted to have his employment reinstated by signing, under duress,

the "last chance agreement", the Union and its representatives refused to sign it

and Plaintiff was terminated. (See Exhibit 6)  Plaintiff was denied equal

protection throughout the entire process.  The fitness-for-duty evaluation was

used for pretext to once again terminate the plaintiff, should he be reinstated.

Under the position that the Town of Manchester is currently taking, Plaintiff was

actually terminated on two separate occasions.  This fact would simply reinforce

the validity and strength of Plaintiff's discrimination claim, as he is certainly the

only firefighter to be terminated twice in an environment where for the past

seventeen years no white firefighter was ever terminated -- even once. (See

Plaintiff's deposition page 175 lines 9-16).

44. Admit.

45. Deny.  Plaintiff was terminated on November 17, 2000 and David Mayer actually

escorted Diggs to retrieve his personal belongings from his locker (See Exhibit 6).

As far as returning to the firehouse, Plaintiff was told that he would be arrested for

trespassing if he was caught anywhere on Town property.  (See Plaintiff's deposition

page 185 line 23-25)  On November 21, 2000 David Mayer filed a grievance for

termination for Plaintiff which cited termination date as November 17, 2000.  (See

Exhibit 8).  Plaintiff's job was never properly reinstated and Plaintiff never returned

to his position after his termination on November 17, 2000.  (See Plaintiff's

deposition pages 185 line 8-18)

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800 (O)   (203) 368-6985 (Fax)
cynthia.jennings@sbcglobal.net

46. Admit.

47. Admit.

48. Deny.   Plaintiff was terminated by the Town of Manchester on November 17,

2000. Plaintiff received unemployment compensation. (See Plaintiff's deposition

page 186 lines 8-10)  Although the terms and conditions stipulated for Plaintiff's

reinstatement after he had been terminated from his position of firefighter were

never agreed upon, and the "last chance" agreement was never executed by Local

1579, Plaintiff, under duress, and in order to save his job, signed the "last chance

agreement." (See Exhibit 9)  Defendants Town of Manchester and Local 1579 by

David Mayer conspired to reinstate Plaintiff only to have him terminated without

ramifications to the Town of Manchester.  On November 27, 2000, Chief

Bycholski sent a letter to David Mayer.  This letter states, "After further

consideration, post hearing, it was decided to adjust the stated disciplinary actions

to allow for a continuation of FF Diggs Employment.  (See Exhibit 10)  This

"post hearing" and "consideration" was had without any knowledge to Plaintiff.

This again shows Town of Manchester and Local 1579 working together to rehire

Plaintiff only to terminate him without legal ramifications to the Town of

Manchester.  On January 25, 2001, defendant Town of Manchester claims that

they again terminated Plaintiff, allegedly because he refused to permit defendant

Town's psychiatrist full access to his mental health records so that a fitness-for-

duty evaluation could be performed.  (See Exhibit 11) This is also untrue.

Plaintiff complied with the Town's request by signing a form that was issued by

8

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800 (O)   (203) 368-6985 (Fax)
cynthia.jennings@sbcglobal.net

Dr. Selig himself. This form says that Dr. Selig is entitled to **all** mental health records from **all** providers clearly showing Plaintiff's compliance with Bycholski's letter dated November 21, 2000. (See Exhibit 12). David Mayer, the Union President representative had a signed release from Plaintiff, which would allow records from his personnel file to be accessed (See Exhibit 13) Plaintiff's personnel file had medical information from Dr. Thelissa A. Harris and Sarah Gamble, licensed Psychologists both of which Dr. Selig could have used in his evaluation. (See Exhibit 14). Plaintiff continued to comply with the Last Chance Agreement and the request for fitness for duty evaluation by seeing Ms. Dube and a counselor with the EAP program on more than one occasion. Plaintiff also admits to seeing Joanne Cannon as requested by the Town of Manchester. (See Plaintiff's deposition pages 140, 141) Each of the defendants shared the common objective of the conspiracy against the Plaintiff which was to bring Plaintiff back to work, continue to deny his grievances, continue to deny him the opportunity to collect unemployment compensation, and to protect the Town of Manchester from civil litigation and the associated costs, while continuing to violate the constitutional and civil rights of Plaintiff. (See Plaintiff's deposition pages 138-140)

49. Admit.

50. Admit.

51. Admit.

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800 (O)  (203) 368-6985 (Fax)
cynthia.jennings@sbcglobal.net

52. Admit in part, deny in part. Plaintiff was terminated on November 17, 2000 and David Mayer actually escorted Diggs to retrieve his personal belongings from his locker (See Exhibit 4). As far as returning to the firehouse, Plaintiff was told that he would be arrested for trespassing if he was caught anywhere on Town property. (See Plaintiff's deposition page 185 line 23-25) On November 21, 2000 David Mayer filed a grievance for termination for Plaintiff. Plaintiff's job was never properly reinstated and Plaintiff never returned to his position after his termination on November 17, 2000. (See Plaintiff's deposition pages 185 line 8-18)

53. Admit.

54. Admit.

55. Admit in part, deny in part. There were many incidents where Plaintiff was disciplined and written up by the Defendants with no representation from any officer or representative of IAFF, Local 1579. Plaintiff's personnel file is filled with "Memos to File" from Chief Rivosa, Deputy Chief Bycholski and Chief Beckwith which the Defendant's use as evidence. (See Exhibit 1) On August 28, 1988 Robert Martin, the Union President was not even aware that Plaintiff had filed a claim. (See Exhibit 2).

56. Admit and deny. Plaintiff was terminated on November 17, 2000 and David Mayer actually escorted Diggs to retrieve his personal belongings from his locker (See Exhibit 6). As far as returning to the firehouse, Plaintiff was told that he would be arrested for trespassing if he was caught anywhere on Town property.

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800 (O)   (203) 368-6985 (Fax)
cynthia.jennings@sbcglobal.net

(See Plaintiff's deposition page 185 line 23-25) On November 21, 2000 David

Mayer filed a grievance for termination for Plaintiff. Plaintiff's job was never

properly reinstated and Plaintiff never returned to his position after his

termination on November 17, 2000. (See Plaintiff's deposition pages 185 line 8-

18) Local 1579 filed a grievance on November 30, 2000 requesting the

reinstatement of employment for Plaintiff along with full back pay and benefits.

(See Exhibit 15). Plaintiff was ultimately terminated from his employment for

failing to accept discriminatory treatment and a hostile work environment by the

Town of Manchester (See Exhibit 6). Defendant Bycholski in concert with other

agents of the Town of Manchester, and Union Local 1579.

57. Admit.

FOR PLAINTIFF
Marcus H. Diggs

By _____
Cynthia R. Jennings, Esq. (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street
Bridgeport, CT 06604
(203) 334-4800 (O)
(203) 368-6985 (Fax)
cynthia.jennings@sbcglobal.net

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800 (O)   (203) 368-6985 (Fax)
cynthia.jennings@sbcglobal.net

## CERTIFICATION

This is to certify that the above Plaintiff's Local Rule 56 Statement was delivered to the following attorneys on November 12, 2003.

James C. Ferguson
FERGUSON & DOYLE, P.C.
35 Marshall Road
Rocky Hill, CT
860-529-4762

Alexandria L. Buford
HOWD & LUDORF
65 Wethersfield Avenue
Hartford, CT  06614

_____
Cynthia R. Jennings, Esq.

12

Cynthia R. Jennings, Esquire (ct21797)
THE BARRISTER LAW GROUP, LLC
211 State Street; Bridgeport, CT 06604
(203) 334-4800 (O)   (203) 368-6985 (Fax)
cynthia.jennings@sbcglobal.net

## PLAINTIFF'S EXHIBITS IN FOR LOCAL RULE 56(a)2 STATEMENT OF UNDISPUTED FACTS

**Exhibit 1**   "Memos to file" which Defendants met with Plaintiff without representation from the union

**Exhibit 2**   August 28, 1988 letter from Chief Rivosa regarding a hearing with Plaintiff where Union was not apprised nor present to represent Plaintiff.

**Exhibit 3**   September 7, 1988 letter from Chief Rivosa admitting Plaintiff asked for and was not allowed Union representation. This letter also admits that Plaintiff was not aware of Chief Bycholski's role as acting chief.

**Exhibit 4**   August 10, 1988 Grievance filed by Plaintiff due to his denial by Defendants of Union representation.

**Exhibit 5**   August 11, 1988 Letter from Chief Bycholski stating Chief Beckwith's recommendation of Discipline.

**Exhibit 6**   11/18/2000 Memo from Chief Bycholski where:
1. Discussions were had without Plaintiff
2. Plaintiff was advised that he would be terminate that day
3. Plaintiff was told that he was not allowed to enter into the building after November 17, 2000
4. Arrangements were made for Plaintiff to be escorted to retrieve his personnel belongings by David Mayer, Union representative
5. Plaintiff was offered a Last Chance Agreement
6. Last Chance Agreement was considered a "draft"
7. Plaintiff asked for his attorney to review said Agreement and was denied
8. Retraction of Agreement by Town of Manchester Fire Department and termination was effective immediately.

**Exhibit 7**   8/7, 8/11 and 8/31/ 2000 Memos and letters which show conflict of interest on behalf of Plaintiff and injustice to have Marc Luppichino act as a Local 1579 representative on Plaintiff's behalf.

**Exhibit 8**   November 21, 2000 – two grievances filed by Local 1579 citing November 17, 2000 as the termination date of Plaintiff. Local 1579 also acknowledges and assents to Plaintiff signing away his rights by signing this Last chance Agreement.

**Exhibit 9**   November 17, 2000 Last Chance Agreement from the Town of

1

Manchester.

**Exhibit 10**      November 27, 2000 Letter from Town of Manchester noting date of termination of Plaintiff as November 17, 2000. This letter also speaks of conspiracy where a post hearing was had without Plaintiff.

**Exhibit 11**      January 25, 2001 letter from the Town of Manchester again attempts to fire Plaintiff for failure to comply with November 21, 2000 letter.

**Exhibit 12**      December 1, 2000 form from Dr. Selig which Plaintiff signed to allow Dr. Selig access to all of his mental records.

**Exhibit 13**      November 30, 2000 letter to David Mayer from Plaintiff allowing Local 1579 access to his personnel file.

**Exhibit 14**      Letters dated August 8th and August 31st, 1995 what were in Plaintiff's personnel file from Sarah Gamble and Thelissa Harris, both licensed Psychologist.

**Exhibit 15**      November 30, 2000 Grievance filed by Local 1579 asking for Plaintiff to be reinstated to employment by Town of Manchester. Local 1579 also acknowledges that Plaintiff had not received pay or benefits from his termination of November 17, 2000 by his request of back pay and benefits.

**Deposition of Plaintiff, Marcus Diggs is annexed behind the Plaintiff's Exhibit List**
**Exhibits:**      **A - U**

2

January 31, 1989

MEMO TO FILE:


On January 27, 1989 a meeting was held in my office relative to Marcus Diggs.  Those present were: Marcus Diggs, Deputy Chief Bycholski and myself.

At this meeting we discussed Marcus Diggs progress that has been made since he was returned to Headquarters.  Marucs was told that his attitude has been improving but that it could stand some more improvement.

He was then told that he could return to Station #4 the next time his shift worked nights (January 29, 1989) and this has been done.

Chief John C. Rivosa

JCR:jw

69

# MEMO

**To:**       Chief Tom Weber
**From:**     Robert Bycholski, Deputy Fire Chief
**Subject:**  DIGGS, Marcus (Administrative Action)
**Date:**     May 20, 1998

On the morning of Wednesday, May 20, 1998, I was advised by Linda Accarpio that seven toll calls were charged to the Department by a caller from Station-4 on four dates over a one month period. Each of the calls were made while Shift-1 was scheduled to work. A records check indicated that five different on-duty Firefighters were working those dates and times. A common denominator, when six of the seven calls were made, was Firefighter Marcus Diggs.

At 1310 hours, Wednesday, May 20, 1998, I met with Firefighter Diggs in the Chiefs' office. Firefighter Diggs was advised that I intended to interview him as part of an official departmental investigation with questions specifically and narrowly related to toll calls made from Station 4, and charged to the Fire Department, at times when he was working. I further advised Firefighter Diggs that if during or following this interview there was reasonable cause to suggest that Firefighter Diggs had violated established Departmental Policy he could and should expect administrative action to be initiated against him.

I advised Firefighter Diggs that he was entitled to representation by his union or another third party of his choosing before the interview began and/or at any time during the interview. Firefighter Diggs declined representation stating that he didn't see any need to have anyone with him. I encouraged Firefighter Diggs to reconsider his decision reiterating that administrative action, disciplinary in nature, could result from this interview. He declined a second time.

Firefighter Diggs was presented with the date, time, city and state of each call in question. He freely accepted responsibility for the toll calls of:

| 2/22/98 | 2141 hrs | Marlboro, MD | 2.5 minutes | $6.74 |
| 2/22/98 | 2221 hrs | Phila. PA | 1.0 minutes | 2.35 |
| 3/01/98 | 1329 hrs | Waco, TX | 85.3 minutes | 32.89 |

Firefighter Diggs was unsure of the following toll calls:

Chief Tom Weber
Page 2
May 20, 1998

| 2/22/98 | 2250 hrs | New Haven, CT | 2.2 minutes | $0.24 |
| 3/16/98 | 1204 hrs | Southington, CT | 0.6 minutes | 0.05 |
| 3/16/98 | 1628 hrs | Southington, CT | 3.0 minutes | 0.27 |

I advised Firefighter Diggs that he had violated department policy by causing toll charges for his personal calls to be charged to the department. Firefighter Diggs acknowledged that he was aware of the policy and that he knew the policy pertained to him. Firefighter Diggs was advised that I was recommending the following actions be taken for such violation.

1. Firefighter Diggs would reimburse the Department $41.98 for the three phones charges he has taken responsibility for
2. Firefighter Diggs would receive a "written reprimand" from the Office of the Chief for violation of departmental policy
3. Firefighter Diggs would be subject to further administrative action, for any similar violations of this specific policy, which occur post 1330 hours, May 20, 1998.

Additionally it was agreed that Firefighter Diggs would report back to me regarding the three calls he was unsure of to confirm he did or did not make those calls.

Firefighter Diggs was also advised that the call to Waco, TX was almost 90 minutes in duration which violates the spirit of departmental policy which calls for personal calls to be short and not tie up business lines for extended periods of time. No action was taken on this.

Finally, Firefighter Diggs was advised that any notes that I developed as a result of our meeting would be forwarded to the Chiefs office and may also become part of his file(s), at Human Resources and Chiefs Office, and that he was entitled to review his file(s) by making application through the Chiefs office.

*RECEIVED*

TO:        Chief John C. Rivosa                                    AUG 1 4 1995

FROM:      Deputy Chief Robert Bycholski  *RB*              BY: ___ _____

SUBJECT:   Meeting with FF Marcus Diggs; First working shift following reassignment
           TOWN OF ＿ CHESTER

DATE:      August 11, 1995


On Friday, August 11, 1995, I informed Firefighter Marcus Diggs, prior to the start of the evening shift, that I wanted to meet with him regarding his status, function and requirements for him to reconcile himself while in his current assignment. My reason for wanting to meet with him was because this would be his first date working his new assignment here at Headquarters and I wanted us both to be prepared to begin this new working relationship. FF Diggs inquired as to if he should have union representation present to which I replied "Absolutely, I highly recommend it".

At approximately 1805 hours FF Diggs returned to my office with FF Robert Barker (Union President). I began by telling both why I wanted to meet with Diggs. I stated that I wanted to discuss Diggs strengths and weaknesses, as I knew them to be because of my past association with FF Diggs as his supervisor, in some capacity, since his initial hiring. I also told them I wanted to discuss candidly the areas in which I felt FF Diggs could get himself into trouble if he persisted in indulging into these areas.

I began the meeting by informing Marcus that I felt his areas of strength were his firefighting capability and ability and his capability and ability in rendering emergency medical aid. I stated that I felt his performance in these areas was good and I couldn't recall ever having to counsel him for being deficient in these areas.

I then went on to say that the list of what I considered to weaknesses was a little longer. I told him that I was basing these conclusions on my own observations and involvement with him over the many years that we worked together. I also told him that there were some areas I would discuss, involving him, that I had no personal involvement in but because of my position I was aware of.

I first told Diggs that I fully expected him to show initative and to participate in the performance of all mandated and required workload, including general housework, special assigned details and watchroom duty to include correct logging on the incident log sheet as well as the logs pertaining to fire alarms systems status, streets status, hydrant status, etc. I told him that I expected him to employ proper radio communication procedure. I advised him that I expected him to use proper telephone communication etiquette involving business calls and the taking of messages for department personnel. I also told him I expected him to ~~five~~ give a proper and cordial greeting to any visitor coming into the station.

I advised FF Diggs that, regarding telephones, I expected him to keep his personal phone calls, in

57

both number and duration, down to a reasonable number. I also told firefighter Diggs that I expected him to develop and practice a non-antagonistic and non-argumentative posture in his interaction with peers and supervisors. I told him directly if he was ever in any way, shape or form involved in the instigation of any verbal altercation or "baiting" of other personnel I would not hesitate to have him disciplined to the fullest extend.

For your information during this entire meeting it was my feeling that FF Diggs was acting as his own attorney and questioning me as to why I was bringing up all these things since he didn't feel I had any justification to bring up the issues I was addressing. A couple of times he asked if he could leave the office to confer with R. Barker (who was present during the entire meeting) to which I replied he could not until I finished addressing the areas I wanted to address. Essentially Diggs was laughing, making exaggerated facial expressions and bantering in a disruptive manner during the entire meeting. At one point I informed him that it was necessary for him to know that he had left the clubhouse down at School Street where he had control of the place and now he was working in my house where I made the rules and would not tolerate his antics such as the ones I was witnessing. I told him that we needed to make one thing crystal clear right away and that was that I was the boss and I was not intimidated or afraid of his threats of getting attorney representation and I would no longer tolerate him being an ass during the meeting. He looked to R. Barker at this time for guidance and R. Barker advised him to remain seated and listen to the remainder of what I had to say.

As FF Diggs had asked for my justification in addressing some issues I have him the nutshell versions of why I felt the areas needed to be addressed.

(1) Regarding his needing to use proper telephone etiquette I advised him that on more than one occasion he had answered or spoke inappropriately to the caller. I would not refresh his memory as to the specifics of the calls in question but for your information one time he spoke in appropriately to Irene Smith (7/13/84); one time he and his partner refused to answer the house phone at station 4 when it rang (8/21/93); one time he failed to forward a personal phone call to an officer who was in the station (8/28/92) and the most recent event involving FF M Lupacchino and his wife (8/7/95).

(2) Regarding his needing to properly greet visitors coming into the station I told him it involved a member of the Board of Directors who came in and was treated rudely by him. Again I gave no specifics but it involved Thomas Ryan, on 8/17/92.

(3) Regarding his excessive use of the telephone in both number of calls and duration of calls as you are aware there have been numerous times, too many to count, where he has abused telephone useage policy.

(4) Regarding his attitude and behavior you have paper on file regarding J. Tsokalas and verbal altercations with FF Diggs. R. Skoglund and verbal altercations with Diggs. T. Barlow and verbal altercations with Diggs. And most recently M. Lupacchino and a verbal altercation with Diggs.

FF Diggs wanted to see evidence that he had ever been involved in any of the above to which I told him that he needed to see you next week that I wasn't about to waste anymore time catering to his demands.

I concluded the meeting by telling him that the gist of my message tonight was that he needed to walk the straight and narrow like the rest of the personnel assigned to my shift at the center. I told him that if he conformed and worked appropriately that he and I would not have any trouble. However, I cautioned him, if he screwed up it would not be tolerated and he would be held accountable. I reminded him that although there were many times he and I met over his professional behavior and he was reprimanded or counseled we have generally not had many personal disagreements and have maintained a mutually respectable relationship. I told him that would continue as long as he performed appropriately.

Following the meeting I personnally aquainted Diggs with Shift-1's watchroom schedule, housework assignment schedule and gave him a refresher course on the watchroom facilities and procedures.

I will report that once FF R. Barker departed FF Diggs became much more respectful to me and participated cordially with me as I went over his duties here at the center. He stopped being argumenative and was civil in nature and tone. It appeared to me that he had almost been showing off in front of FF Barker. I believe that I made an impression that I was not one he wanted to cross during his tenure here and I hope he continues to realize that I will not tolerate any of the behavior that landed him this reassignment.

TOWN OF MANCHESTER FIRE DEPARTMENT

August 16, 1995

TO:          Fire Chief John C. Rivosa

FROM:        Captain John C. Rivosa, II

RE:          Firefighter Marcus Diggs

On the morning of August 2, 1995 at approximately 9:05 a.m., Firefighter Marcus Diggs was told to go to Hale Road for a drill. Upon arrival, I stepped up onto the running board of Engine 4 to instruct Firefighters Lupacchino and Diggs as to truck placement. At this time, I was confronted with a very angered Firefighter Diggs; he was yelling to me about his not wanting to be here at this time, that it is too hot. I could see he was very upset. I told him that I have a rookie going on shift soon and we needed to test his skills one last time and that we would be out of here soon before it got hot. At that point, I got off the truck and started to walk to another group of men (Firefighters DuBois and Bajoris).

Firefighter Diggs then followed me yelling the whole time about his disapproval of the drill. I then instructed him to do his job. I then told Firefighter DuBois, a Union Executive Board member, to tell him if he kept it up he would be looking at a reprimand. Firefighter DuBois did explain to Firefighter Diggs that he was being insubordinate and that he better keep his mouth shut or get a possible reprimand.

At this point, he did so, but I must add that he seemed very bothered after this.

Captain John C. Rivosa, II
JCRII/m
jcrii.cor

DATE:  October 1, 1988

On Wednesday, September 28, 1988, I was participating in an oral board for prospective employees when, at approx. 1100 hours, I received a telephone call from Jean Warren, Chief Rivosa's secretary. Jean informed me that she had received a telephone call from Tom Barlow, Station 4, requesting that I go down to the station as his partner, Marcus Diggs, was displaying some extremely erradic behavior.. I left the interviews and reported to Station 4.

Upon my arrival at station 4 I observed Marcus on the apparatus floor and as I walked into the garage Marcus walked around the opposite side of the engine. As I walked around the engine to see him he continued walking away from me staying on an opposite side of the engine from where I was. I called for him to stop where he was and when I met him I inquired as to where his partner was. He replied that he was in the other room.

I found Tom Barlow upstairs and Tom told me that Marcus had been acting peculiar all morning. He said at the beginning of the shift Marcus went upstairs and fell asleep, sleeping through the morning radio check and also spoundly sleeping through several routine telephone calls. Tom said that he had tried to awaken Marcus a couple of times but it was to no avail as Marcus was sleeping too soundly. Finally, Tom said, Marcus woke up and went downstairs and began switching television channels , talking continuously and pacing back and forth. Barlow described the chattering as not making any sense, and Barlow concluded that he was afraid that Marcus was not in any shape to be working. I went back downstairs to talk with Marcus.

I found Marcus outside on the front ramp and asked Marcus if there was anything wrong with him. He denied that anything was wrong. I asked him why he had been sleeping all morning long. He replied "Did I, I didn't know that I did" and then he laughed. I asked him if he felt good enough to be working and he answered "yea man, I feel great" and he laughed once more. I told he that I was concerned about his behavior and told him that his partner had also been concerned about his behavior as he had called me about it. He replied "Hey, ain't he a great guy" and he laughed. I told Marcus that I wanted to see him in my office after lunch and his only reply was "yup". As far as I was concerned at this point, Marcus was displaying normal behavior (for Marcus) and I didn't see any cause to relieve him of duty at this point.

After lunch Marcus reported to my office and his behavior was extremely different from when I had last seen him. He was talking rapidly and continuously and laughing for no reason. Whatever Marcus was saying made no sense to me. It was total jibberish and incomprehensable. Chief Rivosa came into my office and attempted to talk to Marcus but Marcus continued to chatter and laugh and he was figiting and getting up and down in his chair and moving around constantly. The Chief at one point told Marcus that he had never seen him this way before and asked him several times what was wrong with him. Every single thing that Marcus said by this time was total nonsense and his use of profanity was beginning to become constant. I advised Marcus that I was relieving him from duty but that I was not dismissing him from completing his day and that I wanted him to stay in my office until I could arrange for a union steward to come in and participate in this meeting. I called Edward Carini, an on-duty union steward and told him to come to my office.

Upon the arrival of Carini, we continued the meeting. It was now apparent that asking Marcus any questions about what was wrong was futile as his behavior continued to be extemely off the wall. By this time Marcus was picking up objects in my office and tossing them around, walking around laughing and generally talking pure nonsense. I explained to Carini that we were concerned about the cause for this behavior and we wanted Marcus to go to the emergency room and be evaluated and also submit to a urine and blood test. Carini and Marcus took a few minutes to meet privately and upon their return Carini said that Marcus did not tell him anything and that it was up to Marcus if he wanted to go over to the ER to be checked out. Diggs agreed to go over to the ER and to be evaluated and to submit to testing as we requested but he said that he would not sign any paperwork.

At MMH Diggs was evaluated by the ER staff including giving a urine and blood sample. A psychologist examined Marcus, not in our presense for about 45 minutes. The psychologist then informed us that he had decided that Marcus should be committed, involuntarily, to the Institute of Living for psychatric evaluation.

Chief Rivosa and I had the opportunity to talk with Marcus several times after this but his behavior was no different and as a matter of fact at times it became more hostile, at one point where Marcus threw some objects around the room and began punching and kicking the walls in the room in which we were in. His use of profanity was also excessive and he was displaying rude behavior to some of the staff. As a matter of fact the hospital staff, concerned about his behavior, called for police officers to stand by in case Diggs became violent.

Robert Bycholski
Deputy Fire Chief

August 8, 1989

MEMO TO FILE:

On this date I called Marcus Diggs into my office to straighten out a situation that had occurred last week.  On August 3, 1989 Marcus Diggs called in to say that he would not be in to work that night. When asked if he was sick, he said that he was not and did not wish to give any further information.

Present in my office this morning were: Marcus Diggs, Jean Warren and myself.

We asked Marcus if he would be willing to give us a vacation day for the time he had off and he agree.  He signed a vacation slip and this will cover his absence on 8/3/89.  Marcus was asked if he wanted union representation and he refused.  We also told Marcus that the reason he could take a vacation day was that we found an opening.

                                        Chief

Jean F. Warren



# TOWN OF MANCHESTER, CONNECTICUT

**JOHN C. RIVOSA**
Fire Chief — Fire Marshal

**TOWN OF MANCHESTER FIRE DEPARTMENT**
75 Center Street 06040
647-3266

August 25, 1988

Mr. Robert O. Martin, President
Local 1579 I.A.F.F.
138 McKee Street
Manchester, Conn. 06040

Dear Bob:

In reference to your letter dated August 17, 1988, please be advised that it was not my intention to circumvent your participation at the grievance hearing concerning Marcus Diggs.

Art Kapitke, Station #4's union steward, signed the grievance and was informed of the hearing and I assummed you had also been notified.

Please be advised that for all future grievances you will be contacted, if available, otherwise another union officer will be notified.

Very truly yours,

Chief John C. Rivosa

JCR:jw



# TOWN OF MANCHESTER, CONNECTICUT

JOHN C. RIVOSA
Fire Chief — Fire Marshal

TOWN OF MANCHESTER FIRE DEPARTMENT
75 Center Street 06040
647-3266

August 25, 1988

Mr. Marcus Diggs
150 London Road
Hebron, Conn. 06243

Dear Firefighter Diggs:

Two meetings were held August 17, 1988 and August 21, 1988 regarding the grievance filed by you and Deputy Chief Beckwith's written reprimand with a recommendation of a one week suspension.

Both hearings revealed Portable #4 was not heard from during the morning radio test which was substantiated by members stationed at headquarters. When Deputy Chief Beckwith inquired by phone as to why Portable #4 did not answer the radio test you denied this and a discussion took place as to responsibility for testing radios. This conversation ended by you making a statement, "Come on man it's too early in the morning for that." Deputy Chief Beckwith then told you to report to Headquarters.

At Headquarters Deputy Chief Beckwith asked you why the radio was not tested and problems seemed to occur when you and he were on duty together.

You requested to see the Chief to which Deputy Chief Beckwith replied that I was not going to be in and you would have to deal with him. You got up to leave and Chief Beckwith told you he was not through and you replied, "Fuck you, Beckwith."

Deputy Chief Beckwith asked you to come back and you refused. It was only after you were informed that you were being given a written reprimand with a recommendation of a one week's suspension that you requested Union representation.

You stated that Deputy Chief Beckwith kept on asking you over and over again why wasn't the radio tested, which Chief Beckwith denied.

When you were called to Headquarters Deputy Chief Beckwith had no intention of disciplining you. It was only after you made the insubordinate remark, "Fuck you, Beckwith" that he informed you of the written reprimand and a recommendation of a one week suspension.

Department officers have a right to question deviations of past practices and procedures without being subject to derogatory remarks. The fact that Deputy Chief Beckwith may have asked you several times why the radio was not tested doesnot justify the insubordinate remark, which you admit you said more than once.

The fact that you should have been told that Deputy Chief Bycholski was Acting Chief during my absence has been taken into consideration in the discipline rendered.

In lieu of the recommended one week suspension you have been suspended two days without pay (August 22 and August 23, 1988).

To continue with you present attitude and indifference can only result in termination. I sincerely hope it does not reach that point.

Very truly yours,

Chief John C. Rivosa

JCR:jw

Copy to: Robert O. Martin, President
         Local 1579 I.A.F.F.

September 7, 1988

A grievance hearing was held on this date in my office concerning the grievance of August 29, 1988.  In attendance were: Bob Martin, Union President, Arthur Kapitke, Union Steward, Marcus Diggs, Deputy Chief Beckwith and Chief Rivosa.

Marcus Diggs request for Union representation was not made until at the very end of the discussion with Deputy Chief Beckwith as stated in the letter dated August 25, 1988.

As stated at the hearing, I firmly believe to say to an officer the insubordinate remark, "Fuck you, Beckwith" without provocation warrants more than a one week suspension.

However, I have taken into consideration the fact that Marcus Diggs should have been told Deputy Chief Bycholski was Acting Chief when he requested to see the Chief.  This factor was the major factor in a reduction of the suspension to only two days without pay in lieu of the one week suspension recommended by Deputy Chief Beckwith.

The grievance is hereby denied.

John C Rivosa

Chief