# Professional Fire Fighter Local 1579

ROBERT O. MARTIN
PRESIDENT

TOWN OF MANCHESTER, CONNECTICUT

DAVID M. MAYER
SECRETARY

## GRIEVANCE FORM

Date  8 / 10 / 88

Local Name and Number:

0930 A.M

Employee's Name:  MARCUS DIGGS

Present Working Title and Department:  FIRE FIGHTER    FIREDEPT

Section of Agreement Violated, Including But Not Limited To:

ARTICLE IV, MARCUS ASKED FOR UNION REPRESENTATION, BUT THE MEETING BETWEEN HIM AND BECKWITH CONTINUED,

Statement of Grievance:

MARCUS DIGGS SAYS HE WAS VERBALLY ABUSED BY CHIEF BECKWITH, REGARDING A RADIO CHECK

Remedy Requested:

ACTION RESCINDED.

Grievant's Signature

Union Representative's Signature
Title Union Steward #45

Action Taken:

Result:

### (SEE ATTACHED)

Affiliated with Uniformed Fire Fighters Association of Connecticut
and Greater Hartford Labor Council -- Connecticut AFL-CIO



# TOWN OF MANCHESTER, CONNECTICUT

**JOHN C. RIVOSA**
Fire Chief — Fire Marshal

**TOWN OF MANCHESTER FIRE DEPARTMENT**
75 Center Street 06040
647-3266

August 11, 1988

Mr. Marcus Diggs
150 London Road
Hebron, Conn. 06243

Dear Firefighter Diggs:

This letter is to inform you that Deputy Chief Peter Beckwith has recommended departmental discipliniary action be taken against you as a result of your alleged insubordination and display of disrespectful behavior, directed at Deputy Chief Beckwith, in connection with an incident that took place in his office on Wednesday, August 10, 1988.

Due to the fact that you left work early on the day of the alleged violation, I was unable to meet with you and Deputy Chief Beckwith to discuss the circumstances of the incident. To further complicate matters, your absence from duty, due to sickness, prevents us from meeting in timely fashion to resolve this matter.

As a result of your sickness it is necessary to delay action until your return to duty. This letter is to make you aware that regardless of the time elapsed, upon your return to duty a meeting of the concerned individuals will be held and any appropriate actions will be taken at that time.

A copy of this letter has been forwarded to Local 1579 I.A.F.F.

Very truly yours,

Deputy Chief Robert S. Bycholski
Acting Chief

RSB:jw

# MEMO

**To:** File
**From:** Robert Bycholski
**Subject:** DIGGS, Marcus
**Date:** November 18, 2000

On Friday, November 17, 2000, at approximately 1415 hours I met with FF Marcus Diggs and his Union representatives David Mayer and Marc Lupacchino. I informed FF Diggs and his representatives that it was my duty to inform FF Diggs and his representatives that this meeting was a pre-termination of employment hearing.

I informed those present that the hearing was a result of certain exhibited behavioral problems; recent alleged threats to coworkers in violation of the town's Violence in the Workplace policy and the overall question off FF Diggs fitness for duty and the ability for him to carry out his assigned duties and responsibilities.

I advised FF Diggs that I was genuinely concerned about a variety of recent episodes that have been reported to us, involving FF Diggs with different individuals both within and outside our department. I expressed concern about, what I perceive, and what others have perceived, to be acts of harassment, intimidation, threatening and implied acts of violence on FF Diggs part towards others.

I expressed concern that FF Diggs has been unwilling to take legitimate and reasonable steps to defuse what I considered to be extreme hostility and unruly behavior even after Chief Weber, in the most recent meeting, strongly suggested that he felt Diggs behavior indicated a dire need for intervention.

I stated that I had enormous apprehension regarding the health, safety and well-being of all our other members of the organization when they are working with or around FF Diggs. It was my sense, and I firmly believed, that FF Diggs is an actual threat to himself, his peers and to his supervisors.

I advised those present that I had received six (6) statements from seven department members regarding an episode that allegedly occurred the evening before at Station-4 involving FF Diggs.

File
Page 2
November 18, 2000

In the statements it is alleged that FF Diggs made comments, such as:

"You're on my list"
"You're just like the rest"
"I should come back and take all your heads off"

I stated that I believed these statements constituted thoughts about violence and implied acts of violence. I stated that I believed FF Diggs had unreasonable ideas regarding conspiracies and persecution against himself by others.

I asked FF Diggs if he had anything he wanted to say in reply to what I had just told him. He said something to the effect "Nope, just keep going on".

I advised FF Diggs that I had received information regarding an allegation of his being rude and intimidating to a department volunteer member as recently as last Thursday, November 9, 2000. I advised FF Diggs that around the same time I had received information regarding another negative interaction that allegedly occurred between him and at least two (2) attendants of a commercial ambulance company where he interacted in poor taste.

I advised Mr. Diggs that the Chiefs office had investigated and/or acted on numerous other negative interactions between himself and members of the department as well as persons outside the department.

I advised FF Diggs and the representatives that I take each and every one of these allegations seriously but that I was gravely concerned about the latest event that occurred at Station-4. I advised those present that I believed we have finally reached the point in FF Diggs employment where we need to take the most serious of steps. I advised those present that I felt no alternative but to address the seriousness of FF Diggs behaviors in a very serious way.

I advised FF Diggs and his two representatives that FF Diggs employment with the department would be terminated at the conclusion of this hearing. I advised those present that FF Diggs would be paid through 1800 hours this date. I advised FF Diggs that he was no longer authorized to enter any building property of the department and that arrangements could be made through an Officer of the Department for him to secure any personal belongings in a fire station.

I advised those present that prior to the end of the hearing I would permit FF Diggs and the Union a final last chance offer that would enable FF Diggs to maintain his employment. I advised them that I was going to hand to them an agreement (see attached) for FF Diggs and the union to consider. I advised them that if all eight points of the agreement were agreeable to them then it would take effect immediately and the termination of employment would cease. I advised them that the agreement would have to be signed off on and I urged them, if they were the slightest bit

File
Page 3
November 18, 2000

in disagreement with any part of the agreement, not to sign the agreement. I left the draft of agreement with them and gave them time to themselves.

During their consultation David Mayer came to my office and asked me to consider amending the agreement to only points one through three which they would sign. I advised Mr. Mayer that would not be acceptable and that I would only accept a signed agreement with all eight points included.

Another discussion between Mr. Mayer and myself concerned point number 5. Mr. Mayer stated that point number 5 was illegal and that they couldn't sign an agreement if that was in there. I asked for five minutes to consider it. I called Mr. Mayer back into the office and advised him that point number 5 would be illegal if I was to mandate it or include it in a sanction against Mr. Diggs. I told him that the agreement was actually a draft that I put on the table for them to consider offering back to me. I advised Mr. Mayer that he should consider the agreement as something FF Diggs was offering to me and not that I was offering to him. I advised Mr. Mayer that if the union or FF Diggs had even the slightest reservation about signing the agreement, then they should not.

Mr. Mayer, in another discussion, asked if FF Diggs would be permitted to take the agreement to his attorney to review, and asked if we could delay the termination until that was done. I advised Mr. Mayer that the termination of employment was going to occur today; once the hearing was over. I offered to withdraw the agreement from consideration if FF Diggs and the union had concerns about its legality and content. Mr. Mayer went back into consultation.

Mr. Mayer approached me with a copy of the agreement signed by FF Diggs. Mr. Mayer explained that the union did not sign it because they could not, in good conscience, sign an agreement that stated they would not pursue termination in the future. I advised Mr. Mayer that I would meet with FF Diggs and the union in five minutes.

I met with FF Diggs and his representatives with the agreement signed by FF Diggs. I advised them that the agreement was a document that was intended to be offered to the department by the union and FF Diggs and that if both FF Diggs and the union did not sign the agreement I could not accept it. I offered to retract my offer of an agreement and to proceed with the termination of employment. I left FF Diggs and his representatives to consider this.

Mr. Mayer came back to my office and advised me that the union, after further deliberation, could not sign this agreement. I advised Mr. Mayer that I would retract my offer to accept an agreement in lieu of termination and that the termination was taking effect immediately. I asked Mr. Mayer if he would provide transportation for Mr. Diggs to Station-4 and accompany him while he collected his personal belongings from inside the station; which Mr. Mayer agreed to do.

File
Page 4
November 24, 2000

Mr. Marcus Diggs was advised, verbally at approximately 1615 hours, that his employment with the department (and town) would be terminated.  A letter of employment termination will be sent to Mr. Diggs to confirm.

END

**To: Chief John C. Rivosa**                    August 7, 1995

**From: Deputy Chief John Hughes**

**Re: Altercation between Marcus Diggs and Marc Lupacchino**

At approximately 1715 on this date I received a telephone call from Marc Lupacchino at Station 4 requesting the Duty Officers presence as he and M. Diggs were engaged in a loud verbal arguement. As it was shift change and Deputy Chief Robert Bycholski was still in quarters, we both decided to go to Station 4 as both men involved were working the day shift, Deputy Chief Bycholskis' shift. I took Car 2 and he followed shortly in his private vehicle.

I arrived first and found M. Lupacchino at the front of the building, in front of Engine 4, in a highly agitated state. I attempted to ask him what was happening but realized he needed a bit more time to calm down. I then went to M. Diggs to get his version of the events.

M. Diggs stated that he did indeed drop the phone backhanded style to the glass topped desk from a distance I took to be about one foot and it did make quite a bit of noise. I asked if this was his typical way of putting the phone down for another, he stated it was not. He said it may have inadvertantly dropped from his hand but the backhanded way he showed me, with his hand under the phone, makes it virtually impossible to have the phone slip from ones hand.

M. Diggs was also in a highly agitated state and I left the lounge area and met Deputy Chief Bycholski and M. Lupacchino on the apparatus floor where M. Lupacchino was explaining his version of the story. M. Diggs came to the apparatus floor and a shouting match ensued between M. Diggs and M. Lupacchino. At this time, Deputy Chief Bycholski took M. Diggs aside and attempted to calm him. Part of the shouting dealt with M. Lupaccino stating how it showed no respect for the person on the phone to have it dropped as it was and M. Diggs stating that he dropped the phone because M. Lupacchino was too lazy to leave his newspaper to answer the phone in the first place.

At this time it was decided that, so close to the shift change , M. Diggs was to be relieved from the remainder of his shift (with pay) and to leave the firehouse. M. Diggs left with no more words being said. M. Lupacchino was directed to go to Station 2 at the first convenient opportunity and give a written statement. He stated that he would do so when he is relieved from his shift that day. It must be noted that M. Diggs was told he is to give his version on his next scheduled shift, that being 08/08/95 day shift.

Deputy Chief Bycholski and myself decided that our findings would be written and the Chief of the Department would be notified as soon as possible.

M. Diggs has a history of being uncordial to the public (see report dated 8/17/92,see report dated 8/28/92) and has been reprimanded for improper watchroom mannerisms concerning the public and improper telephone procedures. Marcus has also recently been accused formally of verbal abuse, threatening and harassment toward another firefighter (see memorandum to Chief Rivosa dated 7/11/94). This inability to act respectfully toward the public by M. Diggs, as well as his inability, at times, to work alongside his peers is a pattern that is not aided by his position at Station 4. He has shown the need to be closely supervised in order to ensure that altercations such as this do not occur. If the allegations by M. Lupacchino are found to be correct and accurate then it is my recomendation that M. Diggs be at the very least reassigned to Station 2 for close

25

Marcus H. Diggs
150 London rd.
Hebron,Ct 06248

Aug.31,1995

John C. Rivosa
Fire Chief- Fire Marshall

Dear Chief Rivosa

    I have not read Mr Lupachino's statement,but I do have your
letter summarizing his account of the event at station 4 at 5:00pm on
Aug 7,1995. At this point in time,I would like to make some written
clarifications.
    I have, in our initial meeting on Aug.8 (when I didn't feel
like speaking) and at the grievance hearing on Aug.30, disclaimed and
adamantly denied dropping the phone. I don't deny that it made an
abnormal noise, although I do deny any allegation that it was a very
loud impact or a very loud noise, unless that allegation is coming
directly from Mrs. Lupachino. She is the only one who could feel this
way.
    The so-called verbal,obscene arguing started with Mr. lupachino
shouting "F   You Marcus" in an extremely volatile manner. It caught
me by total surprise but I naturally returned the favor, although
there was no volatility in my voice other than the words I spoke. At
that point he repeated with even more volatility those initial words
he spoke after answering the phone. Then he accused me of slamming the
phone down, not dropping it, in his wife's ear. I tried to explain to
him that he was being silly,but he just kept on cussing me. Eventually
my temper equalled his. I don't remember if that was before or after(I
think it was after) he made the statement "don't make me call the
deputy". This was not the first time he had threatened to call the
deputy on me. The first time he made this threat was when I had
forgotten to clean a fork and plate I had eaten off of the night
before. And regardless of that fact my response was not as he stated.
I didn't call him a p   y until after the call to the deputy was
made. My response was more like "what is the deputy going to do to me
for putting the phone down on the table. Well,Surprise! Surprise!
    One more important fact. Marc never asked me to apologize, he
never asked me anything. I tried to explain to him that he was being
silly and he wasn't interested. He was sitting less than ten feet away
when I answered the phone. I heard the noise, Mrs. lupachino heard the
noise. How come Marc didn't hear it? and if he did, Why didn't he say
something before he answered the phone?

    If you can answer these questions to my satisfaction, I will
gladly return to work under your conditions.

Respectfully

Marcus H. Diggs

P.S. Contrary to your previous assessment during the tsokalas
incident, I hate arguments but I do like a good constructive debate!

2\

*8-11-95*

Marcus H. Diggs
150 London Rd.
Hebron, Ct. 06248
(203) 645-0059

John C. Rivosa
75 Center st.
Manchester, Ct. 06040

Dear Chief Rivosa

I have recieved your letter concerning the incident with Mr. Lupacchino. I have called Mrs. Lupacchino and apologized for any discomfort I may have caused and tried to assure her that no offense was intended. Larry Talbot witnessed the call and can submit to the courteous nature of our conversation.

On the other hand, I feel that, for you to hold me at fault for Mr. Lupachino's outburst is a mistake. I maintain that it was his unorthodox manner of trying to obtain a remedy for his wife's ill feelings that was the true provocation in this incident. The part that I played is an obvious misunderstanding on both Mr. and Mrs. Lupachino's part. I believe the demonstration I gave Deputy Chief Hughes will attest to this.

I further submit that in the past year, since the first incident on July 27, 1994, I have worked with virtually every member of your department due to my unique position. I have maintained a working relationship with all of them, with the exception of Mr. Lupacchino. I feel that I can still have a working relationship with him if he would apologize for his over reaction during this incidence.

Therefore, I am asking you to rescind my reassignment. I am also requesting that you use the power given to you through the bargaining units, to assign me a regular partner at Co #4. I feel that this is the only possible remedy for my current ills. and any further inaction on your part will be the cause of any ineffective working relationships that may arise in the future.

Sincerely,

Marcus H Diggs

cc: Robert Barker, President Local 1579

26

# Professional Fire Fighters Local 1579

138 McKEE STREET
MANCHESTER, CONNECTICUT 06040

## GRIEVANCE FORM
### STEP _1_

**RECEIVED**

**NOV 21 2000**

**TMFD**

DATE. _11-21-00_

Employee's Name. _Marcus Diggs_

Present Working Postion. _Fire Fighter_        Date of Grievance. _11/17/00_

Section of Collective Bargaining Agreement Violated, Including but not limited to: Article. _IV, XXVII, XXVIII_    Section. _4.1, 27.2, 28.1_

Statement of Grievance: _Employee as of 11-17-00 was terminated._

Remedy Requested: _____

Copy to U.P.F.F.A.  Yes _✓_  No___        Copy on file 1579.  Yes _✓_ No___

_Marcus Diggs_.Grievants Signature

_Dr. D. Mahan_.Union Representative Signature

Title: PRES. _✓_, V.P. ___, SEC. ___
TRES ___, STEW, ___, OTHER ___

Action Taken: _See Attached Letter, dated 27 Nov 00_

Results: _____

rev: 6-6-96 rlb

Affiliated with International Association of Fire Fighters, Uniformed Professional Fire Fighters of Connecticut, Connecticut State AFL-CIO, Greater Hartford Labor Council.

# Professional Fire Fighters Local 1579

138 McKEE STREET
MANCHESTER, CONNECTICUT 06040

## GRIEVANCE FORM
### STEP _1_

DATE. _11/21/00_

Employee's Name. _MARCUS DIGGS_

Present Working Postion. _FIRE FIGHTER_    Date of Grievance. _11/17/00_

Section of Collective Bargaining Agreement Violated, Including but not limited to: Article. _IV, XXVII, XXVIII_ Section. _4.1, 27.2, 28.1_

_____

Statement of Grievance: _EMPLOYEE TERMINATED AS OF_

_11/17/00 — HEARING HELD SAME DAY AS TERMINATION —_

_EMPLOYEE ASKED TO SIGN AWAY HIS RIGHTS IN AGREEMENT,_
_ALSO AL_
Remedy Requested: _____

_____

Copy to U.P.F.F.A.  Yes___   No___      Copy on file 1579.  Yes _✓_ No___

_____. Grievants Signature

_____. Union Representative Signature

Title: PRES.___, V.P.___, SEC.___
TRES___, STEW,___, OTHER___.

Action Taken: _____

_____

Results: _____

_____

rev;6-6-96 rtb

Affiliated with International Association of Fire Fighters, Uniformed Professional Fire Fighters
of Connecticut, Connecticut State AFL-CIO, Greater Hartford Labor Council.

### AGREEMENT
### BETWEEN THE
### TOWN OF MANCHESTER (TOWN)
### AND
### MARCUS DIGGS
### AND
### LOCAL 1579, IAFF (UNION)

### Recitals

**Whereas,**   Marcus Diggs in the last several weeks has exhibited certain behavioral patterns which call into question his fitness for duty and the ability for him to safely carry out his assigned responsibilities; and

**Whereas,**   Recent alleged threats to coworkers are in violation of the Town's Violence in the Workplace Policy; and

**Whereas,**   In lieu of termination, the parties have agreed to enter into this document dated November 17, 2000.

**Now, therefore,** the Town, in lieu of immediately terminating Mr. Marcus Diggs, shall upon the request of the Union and Mr. Diggs provide Mr. Diggs with the absolute final last chance to continue his employment with the Town conditioned upon the following:

1.  Mr. Diggs shall agree to a fitness for duty evaluation conducted by a psychologist and/or psychiatrist of the Town's choosing. Mr. Diggs shall sign the necessary medical releases to allow the Town access to the results of the fitness for duty examination.

2.  Mr. Diggs shall agree to see a counselor associated with the Town's Employment Assistance Program and attend follow-up counseling sessions, if deemed necessary by said program.

3.  Mr. Diggs shall be suspended for five (5) workdays as a result of the threatening statements which he made to Firefighters on the evening of November 16, 2000. Said suspension shall be effective on the workdays of November 18, 19, 24, 25, and 26, 2000.

4.  Should the Town, in its sole discretion and for any reason during the remainder of Mr. Diggs' employment with the Town, have any concerns associated with his behavior and/or ability to perform required duties, and/or as a result of the Town's evaluation of the fitness for duty report referenced herein, then his employment with the Town would be immediately terminated.

5.  Should Mr. Diggs' employment be terminated, he shall have no right to appeal said termination through the grievance procedure and/or file a claim for relief with any

other administrative agencies or with the judicial system.

6. This Agreement shall remain in effect throughout the remainder of Mr. Diggs' employment with the Town of Manchester. The procedure to terminate Mr. Diggs' employment as a result of a violation of this Agreement shall be to give Mr. Diggs notice in writing indicating the effective date of his termination of employment. No prior meetings shall be required, nor shall there be any requirement to notify or discuss the matter with the Union.

7. Nothing stated herein in regard to the suspension and/or fitness for duty evaluation shall be subject to the grievance process and/or a claim for relief with any other administrative agencies or with the judicial system.

8. Until such time that the Town has received the fitness for duty evaluation referenced herein and have determined Mr. Diggs' employment status, then Mr. Diggs shall be on unpaid leave of absence, and shall at no time visit any of the Town facilities, except as ordered by a superior officer.

**TOWN OF MANCHESTER**                    **LOCAL 1579, IAFF**


_____                    _____

                                            **David Mayer**
                                            **Its President**


_____                    _____
Marcus Diggs                                L

U:\FIRE\AGREEMENTS\DIGGS-AGREEMENT.wpd

-2-



*Town of*
# MANCHESTER
## FIRE - RESCUE - EMS

*75 Center Street*
*Manchester, CT 06040*
*Phone: (860)647-3266*
*Fax: (860)647-3268*
*www.ci.manchester.ct.us.fire*

*Robert S. Bycholski, Assistant Fire Chief*

27 November 2000

Mr. David M. Mayer, President
Local 1579: I.A.F.F.
153 Spruce Street
Manchester, Connecticut 06040

Dear President Mayer,

I am in receipt of one (1) grievance, dated 11/21/2000 and received by the Chiefs' office 11/21/2000. The grievance complaint concerns FF Marcus Diggs and reads:

*Employee as of 11-17-00 was terminated.*

As you are aware FF Diggs was informed at a pre-termination hearing on Friday, November 17, 2000 that I was terminating Firefighter Diggs employment with the department. After further consideration, post hearing, it was decided to adjust the stated disciplinary actions to allow for a continuation of FF Diggs employment. A letter to that effect was sent to FF Diggs via USPS Certified Mail and a copy of this letter was forwarded to you.

Due to the fact that Firefighter Diggs has not had his employment terminated I would suggest that the Step 1 Grievance you have forwarded to me is no longer an issue for the Grievant or Union.

Sincerely,

Robert Bycholski/Assistant Fire Chief

*To minimize the loss of life and property through innovative prevention, education, community involvement, and efficient response*
*to fire, medical, and environmental emergencies.*



*Town of*
# MANCHESTER
## FIRE · RESCUE · EMS

75 Center Street
Manchester, CT 06040
Phone: (860)647-3266
Fax: (860)647-3268
www.ci.manchester.ct.us/fire

Thomas G. Weber, Fire Chief
Robert S. Bycholski, Assistant Fire Chief

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

RECEIVED

25 January 2001

Marcus Diggs
150 London Road
Hebron CT 06248



DEPUTY MANAGER

Dear Mr. Diggs:

On January 24, 2001, at 1:00 p.m., there was a meeting scheduled for you to attend so that a determination could be made on your future employment status.

On November 21, 2000, you were sent a letter with certain requirements that you were to fulfill so that you may maintain your employment with the Town. One of these requirements was to provide medical records to Dr. Selig so he may do an evaluation on your fitness for duty. At a grievance hearing on January 2, 2001 you stated that there would be no further records provided to Dr. Selig. The intent of the January 24th meeting was to determine if that was your final position on releasing your medical records as those records were necessary for a complete fitness-for-duty evaluation. You have also failed to adhere to the requirements stated in the November 21, 2000 letter in regards to attendance and followup with the EAP Program.

Based on your statement of January 2nd and by your absence at the January 24th meeting, we must conclude that you will not be meeting the terms and conditions of the November 21st letter.

Consequently, the Department cannot obtain a complete fitness-for-duty evaluation and we, therefore, must terminate your employment with the Town of Manchester effective Thursday, January 25, 2001.

Sincerely,

Thomas G. Weber
Fire Chief
/m

c:      Steven R. Werbner, Deputy General Manager
        Betty Rosania, Human Resources Director
        David Mayer, President, Local 1579

*To minimize the loss of life and property through innovative prevention, education, community involvement, and efficient response to fire, medical, and environmental emergencies*

MANCHESTER HEALTH DEPT.

Kenneth M. Selig, M.D., J.D.
257 New London Turnpike
Glastonbury, CT 06033
(860) 659-8998

Attachment

_Marcus H. Diggs_  9-10-61
Name of Patient

I authorize Kenneth M. Selig, M.D., J.D., to obtain/release the following information from my case records; to be used for the following purpose: _Evaluation_

_Fitness for duty_

To/From:
(Circle One): _Joanne Cannon_
_Town of Manchester Health Dept._
(Name and Address)

## PSYCHIATRIC AND MEDICAL RECORDS

Intake Summary _____ Physical Examination _____
Discharge Summary _____ Laboratory Results _____
Psychiatric Evaluation _____ Psychological Evaluation _____
Other (Specify) _All Mental Health Records_
_from all providers_

I understand that permission may be withdrawn at any time upon written request. I understand the reasonable benefits and disadvantages of my decision concerning release of the information specified above

P__t Signature _____  Date _Dec 1, 2000_

Witness _Kenneth M. Selig, MD, JD_  Date _12/1/00_

TOTAL P.02

RECEIVED

DEC   4 2000

TMFD

I, Marcus H. Diggs do hereby
Give permission to Local 1579
President, Dave Mayer, to obtain
duplicate copies of My Town of Manchester
Personnel File.

Nov. 30, 2000

Subscribed and Sworn to before me
this 30th day of November

NOTARY PUBLIC
MY COMMISSION EXPIRES   11/30/04

TRAUMATIC
STRESS
INSTITUTE



*RECEIVED*

AUG 1 0 1995

BY: _____
TOWN OF MANCHESTER
FIRE DEPT.

CENTER FOR
ADULT &
ADOLESCENT
PSYCHOTHERAPY          August 9, 1995
        LLC

Chief John Rivosa
Fire Headquarters
75 Center Street
Manchester, CT  06040

Dear Chief Rivosa,

Marcus Diggs met with me today for a 50-minute consultation.  He
expresses concern about his ability to function competently at his job
given recent stressors which have occurred.  Specifically, Mr. Diggs
fears for his physical safety and is concerned about his volatile
temper.  I plan to continue my evaluation of Mr. Diggs in an
appointment scheduled for next Tuesday, August 15th.  At that point I
hope to be able to make a recommendation regarding whether Mr. Diggs
can safely return to work.

Respectfully submitted,

Sarah J. Gamble, Ph.D.
Licensed Psychologist

organ Farms Drive
Windsor
Connecticut 06074-1369
Tel (203) 644-2541
Fax (203) 644-6891
E-Mail CAAPTSI@AOL.com

**THELISSA A. HARRIS, MD**
682 ~~601~~ PROSPECT AVENUE
HARTFORD, CT 06105
(203) 236-2320

31 August 1995

Chief John C. Rivosa
Town of Manchester Fire Department
75 Center Street
Manchester, Ct. 06040

Dear Chief Rivosa:

Following our conversation of 30 August 1995 I examined Mr. Marcus Diggs again and found that he was not ready to return to work. We need to extend his leave for at least another fourteen days.

I do continue to recommend that he be given a permanent partner with whom he can work out a civil living relationship and continue his usual good working relationship.

Thank you for your attention.

Sincerely,

Thelissa A. Harris, MD

# Professional Fire Fighters Local 1579

138 McKEE STREET
MANCHESTER, CONNECTICUT 06040

## GRIEVANCE FORM

STEP __/__

RECEIVED

NOV 3 0 2000

TMFD

DATE. _11/30/00_

Employee's Name. _Marcus Diggs_

Present Working Postion. _Firefighter/EMr_    Date of Grievance _11/21/00_

Section of Collective Bargaining Agreement Violated, Including but not limited to: Article. _IV_    Section. _4.1_

Statement of Grievance: _Suspension/Unpaid leave of absence without Just Cause._

Remedy Requested: _Reinstatement of Employee and full back Pay and benefits_

Copy to U.P.F.F.A. Yes _/_ No___    Copy on file 1579. Yes _/_ No___

_____ Grievants Signature

_____ Union Representative Signature

Title: PRES.___, V.P. _√_, SEC.___
TRES___, STEW,___, OTHER _√_.

Action Taken: _See Attached Correspondence; dated 8 Dec 00._
_RB₁₁_

Results:_____

rev;6-6-96 rtb

Affiliated with International Association of Fire Fighters, Uniformed Professional Fire Fighters of Connecticut, Connecticut State AFL-CIO, Greater Hartford Labor Council.

**DEPOSITION OF PLAINTIFF**
(In part as to relevance to Plaintiff's Local Rule 56(a)2 Statement of Undisputed
Facts)
**IN THE CASE OF MARCUS H. DIGGS V.
TOWN OF MANCHESTER, STEVEN WERBNER, THOMAS WERBER,
ROBERT BYCHOLSKI IN THEIR INDIVIDUAL AND OFFICIAL CAPACITY
AND LOCAL 1579 IAFF DAVID M. MAYER.**

Q.   Okay.   What about the incident with John in 1994, do you recall if you were suspended?

A.   I'm pretty sure I was suspended there.

Q.   If you don't have documentation to support that, would you agree with me that you were not suspended?

A.   No, I wouldn't.

Q.   Okay.   What's your basis?

A.   A lot of documation (sic) has been expunge and a lot of the documentation originally created isn't in my file any more, don't exist any more.   A lot of stuff's been taken out and thrown away.

Q.   Okay.   So there may be suspensions, but not part --

A.   Not in the record, right.

Q.   Part of your file?   Do you recall any other occasions in which you were suspended?

A.   Um, top of my head, the reason for the '89 complaint was suspension for not testing a portable.

Q.   Can you tell me about that?

A.   I was suspended for supposed not testing a portable that morning, or at least that's what precipitated the suspension.

Q.   Did you?

A.   Did I what?

Q.   Okay.   The claim was that you did not test a portable --

A.   No, there weren't.

Q.   Were there any other women?

A.   No, there were no women other than the secretaries.

Q.   I mean, in terms of fire fighters.

A.   No.

Q.   Okay.  Can you please advise me how long you were there before another black fire fighters was hired?

A.   At least three years.

Q.   Okay.  Would -- can you characterize whether or not -- can you -- I would like to ask whether or not you consider your treatment to have been the same as other similarly situated fire fighters?

A.   I don't understand the question.

Q.   Were you treated like the white fire fighters in your disciplinary behavior and disciplinary actions?

A.   No, I don't believe so.

Q.   Could you give some examples of how you were treated differently than white fire fighters?

A.   I was disciplined for things that they were never disciplined for.  The radio test is an example.

Q.   Could you please explain in more detail how the radio test, how you were treated different in that radio test?

A.   No one had ever been questioned on the radio test.  Nobody ever had been disciplined for not testing a portable.

1    denied this and a discussion took place as to responsibility

2    for testing radios.  This conversation ended by you making a

3    statement, quote, Come on man it's too early in the morning

4    for that, end quote.  Deputy Chief Beckwith then told you to

5    report to Headquarters.

6            Do you agree that you made the statement, quote,

7    Come on man it's too early in the morning for that?

8        A.  I'm thinking eventually I did make that remark, but

9    it wasn't made in the context of that paragraph.

10       Q.  Okay.  What context do you believe it was made?

11       A.  I said it was made after he repeatedly questioned me

12   about the portable, and I repeatedly responded to him.

13       Q.  Okay.  Subsequently, it says you requested to see

14   the Chief to which Deputy Chief Beckwith replied that I was

15   not going to be in and you would have to deal with him.  You

16   got up to leave and Chief Beckwith told you he was not

17   through and you replied, Fuck you, Beckwith, end quote.

18           Do you agree you made a statement, quote, Fuck you,

19   Beckwith, end quote?

20       A.  Yes, I made a statement, repeatedly, but not in the

21   context that it's made in that paragraph.

22       Q.  Okay, but you made the statement repeatedly?

23       A.  Yes, I made the statement.

24       Q.  Okay.  And according to this document you were

25   actually suspended for making the insubordinate remark,

1    A.    Yes.

2    Q.    Have you had opportunity to observe them in their

3    conduct, of there interactions, with the Chiefs and Deputy

4    Chiefs and fire fighters?

5    A.    Yes.

6    Q.    Have you made a comment on whether or not -- or

7    would it be fair to say that profanity is used in the

8    firehouse?

9    A.    Yes.

10   Q.    Would it be fair to say that the profanity is used

11   in interactions with fellow fire fighters?

12   A.    Yes.

13   Q.    And would it be fair to say that in the interactions

14   of fellow fire fighters, the supervisors, officers had also

15   profanity used?

16   A.    Yes.

17   Q.    And how often would you characterize this to take

18   place?

19   A.    Well, on a daily basis.

20   Q.    Now, you've been with the Department how many years

21   total?

22   A.    17 plus.

23   Q.    In your capacity as an African American fire

24   fighter, can you tell me, when you were hired into the

25   Department, where there other African American fire fighters?

A.   As far as I remember the story, none were taken.

Q.   Do you know of any other --

A.   Go ahead.

Q.   -- do you know of any other fire fighters who ever said fuck you to a superior officer?

A.   Yes, I do.

Q.   Who?

A.   I know Bill Sweet did it to Bycholski one day.

Q.   Who's Bill Sweet?

A.   He used to be my partner.  I witnessed that.

Q.   And he said fuck you to who?

A.   He said something to that effect to Bycholski.

Q.   And what did he say?

A.   I don't recall exactly, but I know it was heated and he -- he used some sort of profanity, pretty irate, at Bycholski.

Q.   Did you hear the altercation?

A.   Vaguely, yes.

Q.   Did you hear what Bill Sweet said to Bycholski?

A.   I said, vaguely.  I don't recall at this time.  This is going back 15 years or so.

Q.   Okay.  Well, what do you recall him saying?

A.   Um, I don't recall what he said.  I can recall the manner in which it was said, but I don't recall exactly what was stated or what they were even talking about.  I said it