was something I just kind of overheard.

Q.  When did the incident take place?

A.  I don't know.  It happened during a call years ago. At, um, at a building.  I don't even know what really transpired between them, but Bycholski said something to him and Sweet got mad and said something back to Bycholski.

Q.  Okay.  Do you know approximately when this took place?

A.  When Sweet was working, I said.  Years ago.

Q.  I don't know when Sweet worked.  You got to help me.

A.  15 -- late 80's.

Q.  Okay.  Do you know the context in which this conversation took place with Bill Sweet and Bycholski?

A.  No, I don't really know what they were discussing. All I know is Bycholski said something to Bill Sweet.  Bill Sweet got very mad and, and -- extremely mad from the looks of it.  And it was kind of surprising, you know, to me what he had said to him.  That's all I recall.  I don't recall exactly what was said.  I know he was very upset, there was profanity used, and I don't know what context it was used in, but --

Q.  Do you recall if any action -- or do you know if any action was taken against Bill Sweet as a result of the incident?

A.  As far as I know none were taken.

A.  Scheduled to start work 8:00 o'clock that morning.

Q.  What time did you show up?

A.  Before 8:00 o'clock.

Q.  What happened after you showed up for work?

A.  I showed up, Larry was standing on the ramp smiling, greeted me.  I went in, relieved him of duty, and the day was pretty normal up until about 3:00 o'clock that afternoon when I got a phone call from Dave Mayer.

Q.  I'm sorry.  What time?

A.  3:00 o'clock that afternoon.

Q.  How did Larry greet you that morning?

A.  Like I say, in his normal way.  Well, other than the -- he had a big old grin on his face, but he said, hello, how you doing?  I said, hi, you know?  What's going on?  What have you, the way we normally greet.  I went in and got my gear, put it on the truck, and he left.  I think it was nothing particularly unusual other than that big old smile on his face.

Q.  Before you received the phone call from Dave Mayer, did you have any --

A.  None whatsoever.

Q.  -- I didn't finish the question.

A.  Well, I can -- whatever the question, it's like I had no indication anything was unusual that day at all. There was no calls that day.  It was, you know, no incidents

1    up until 3:00 o'clock when I got the phone call.  Nothing out

2    of the ordinary happened that day.

3         Q.  What did Dave tell you on the phone?

4         A.  Dave said, didn't anyone tell you you're supposed to

5    be up here at 3:00 o'clock for a meeting, you know?  Or

6    eventually he said that.  He says -- he called me up and,

7    yeah, he pretty much said, what's going on?  And I said,

8    nothing.  What's up?  And he's like, you're supposed to be up

9    here at 3:00.  Didn't anyone tell you?  No, nobody told me

10    nothing.  Well, you're supposed to be up here for a meeting

11    at 3:00 o'clock.  And I way on my way and got hung up, got

12    my partner and went up to headquarters.

13         Q.  Did you have any idea why you were supposed to be at

14    this meeting?

15         A.  None whatsoever.  Just showed for the meeting.

16         Q.  Who's present at the meeting?

17         A.  Well, Dave Mayer was there, Mark Lupicino and

18    someone else from the Union, I believe.  It was either Jimmy

19    Deere or someone else.  I forget his name, offhand, too.

20         Q.  And Dave was the Union president at the time;

21    correct?

22         A.  Right.

23         Q.  Was that Mark Lupicino?

24         A.  He was the Union secretary or steward or something.

25         Q.  And then there is another Union person there present

1   as well, too?

2          A.  Right.  I don't think it was Deere.  I think it

3   was -- I forget right now.

4          Q.  And that meeting was with Assistant Chief Bycholski?

5          A.  Right.

6          Q.  Anyone else there for the Town?

7          A.  No.

8          Q.  What happened at that meeting?

9          A.  Bycholski came in, said it was a pre-termination

10  hearing and he went on to cite some incidents from the past

11  and some more recent and said I had till 5:30, I believe it

12  was, to sign the agreement or I'd be terminated.

13                  (Defendant's Exhibit 10:  Marked for

14       Identification.)

15  CONTINUED BY MS. VOCCIO:

16         Q.  I'm showing you what's just been marked Defendant's

17  Exhibit 10, which is titled Agreement Between the Town of

18  Manchester and Marcus Diggs and Local 1579, and ask you if

19  this is the agreement that you were given at that pre-

20  termination hearing?

21         A.  Yeah, this appears to be it.

22         Q.  Did you, in fact, sign this agreement?

23         A.  Um, after much discussion with the Union, yeah.  We

24  agreed that I would sign it, but that the Union would not and

25  could not and I made sure that he would not before I signed

1  it.

2     Q.  Why is that?

3     A.  Because it was something I couldn't see agreeing to,

4  so we decided that, you know, we'd give them my signature as

5  long as the Union couldn't sign it, that I would sign it, and

6  leave the next move up Bycholski.

7     Q.  During that hearing, what incidents did Bycholski

8  bring up?

9     A.  He brought up the incident with the State Trooper,

10  among other incidents; that Volunteer Fire Fighter; um, the

11  incident at MCC, you know, this and that.  Lot of things he

12  brought up were things that I thought were over and done

13  with, you know?  Like the Volunteer Fire Fighter that I had

14  never heard anything else about that.

15        The incident at MCC, you know?  I told him, you

16  know, there were witnesses there.  Ask them what happened,

17  you know, because I had denied whatever the accusation was.

18  I told him what I did, and you know, told him there's other

19  witnesses, ask them, but he brought those up.  And the

20  incidents from September and the -- one of the incidents with

21  Larry Talbit the night before, which is the first I had heard

22  of that.

23     Q.  Did he advise you or did you learn during the

24  meeting that they actually transferred the fire fighters from

25  the station after you left the firehouse?

1    shoot 65 people and still have a job.   Could you reiterate

2    that incident, please?

3         A.   (No response.)

4         Q.   There was an individual who made a comment or did

5    something similar to your statements?

6         A.   Um, well, the statements similar to mine, I'm

7    thinking, only one I could think of, offhand, was John

8    Fuscoe, was that he made a statement threatening harm to

9    some paramedics.   If they ever worked on him, ever touched

10   him.   Made a complaint about that to Deputy Chief Graham

11   McDonald at the time.

12        Q.   And what happened with that complaint?

13        A.   Seemed like it -- seemed like nothing happened.

14   Graham seemed to turn around and have Fuscoe spy on me, I

15   guess.   Looked like something on me --

16        Q.   To your knowledge -- sorry.

17        A.   -- had him watch me and look for --

18        Q.   He --

19        A.   -- he told him to watch me.

20        Q.   To your knowledge, was Mr. Fuscoe ever disciplined

21   for his comments?

22        A.   I don't believe he was.

23        Q.   Has it ever been your experience that any fire

24   fighters were disciplined, to your knowledge, under the work

25   force -- Violence in the Workplace Policy?

1    A.  I don't know of any.

2    Q.  Can you please describe any other situations where

3  you believe you were treated differently, either in terms of

4  the pairing with a partner or the -- let me withdraw that.

5  Were you always paired with a partner in your line of work?

6    A.  No.  There were big lapses in partnership.

7    Q.  And is that generally the situation with all fire

8  fighters?

9    A.  Generally not.

10    Q.  So can you tell me, essentially, how the pairing of

11  partners works in the Department?

12    A.  Well, people bid for stations.  After my partner,

13  Sweet, retired, there's a vacant opening in my house, and

14  remained vacant for, I don't know, years.

15    Q.  You mean you didn't have a partner for years?

16    A.  Right.

17    Q.  Can you tell me about how many years that was?

18    A.  I don't recall.

19    Q.  Can you -- are there any other similarly situated,

20  or can you think of any other incidents where other fire

21  fighters were without a partner for years?

22    A.  Um, I can't say.  I don't think so.

23    Q.  Okay.  You talked about fear for your life, or fear

24  for your life and the lives of others.  Can you give me more

25  details on how you feel their life would be at risk, in your

A.   Scheduled to start work 8:00 o'clock that morning.

Q.   What time did you show up?

A.   Before 8:00 o'clock.

Q.   What happened after you showed up for work?

A.   I showed up, Larry was standing on the ramp smiling, greeted me.  I went in, relieved him of duty, and the day was pretty normal up until about 3:00 o'clock that afternoon when I got a phone call from Dave Mayer.

Q.   I'm sorry.  What time?

A.   3:00 o'clock that afternoon.

Q.   How did Larry greet you that morning?

A.   Like I say, in his normal way.  Well, other than the -- he had a big old grin on his face, but he said, hello, how you doing?  I said, hi, you know?  What's going on?  What have you, the way we normally greet.  I went in and got my gear, put it on the truck, and he left.  I think it was nothing particularly unusual other than that big old smile on his face.

Q.   Before you received the phone call from Dave Mayer, did you have any --

A.   None whatsoever.

Q.   -- I didn't finish the question.

A.   Well, I can -- whatever the question, it's like I had no indication anything was unusual that day at all. There was no calls that day.  It was, you know, no incidents

1   It's something that happened.  I would have to think it would

2   happen at least couple times a week where a unit wasn't

3   tested.  Nobody had ever been called on it before or, you

4   know, ended up being disciplined for it.

5       Q.  Were fire fighters routinely, or was it your -- do

6   you have personal knowledge of fire fighters having been

7   disciplined for swearing or using profanity in the firehouse?

8       A.  No, I don't.

9       Q.  Have you ever known any other fire fighters to be

10  terminated that were permanent fire fighters working for the

11  Department, for the fire department in the Town of

12  Manchester?  Have you ever known any other fire fighters to

13  have been terminated from their employment?

14      A.  No, I don't.

15      Q.  And that would be over a period of how many years?

16      A.  Over 17 plus years.

17      Q.  Okay.  I guess it would be fair to say from this you

18  have been disciplined on numerous occasions; correct?

19      A.  That's correct.

20      Q.  Can you please characterize how your complaints were

21  handled in terms of favorable, as opposed to unfavorable

22  decisions when you -- and withdraw that.  When you filed a

23  complaint, was it -- generally, was it turned over and was it

24  generally ruled in your favor or against you?

25          MS. VOCCIO:  Real quick, you mean a

1       Q.  Okay.  Was that statement ever lifted, to your

2  knowledge?

3       A.  Not to my knowledge.

4       Q.  Did you ever receive a paycheck after that?

5       A.  No, I didn't.

6       Q.  Did you ever have your benefits reinstated?

7       A.  No, I didn't.

8       Q.  Were you able to collect unemployment following the

9  17th of November, 2000?

10      A.  Yes, I did.

11      Q.  Okay.  So for all practical purposes then, you were

12  terminated then, on what date?

13      A.  November 17th.

14      Q.  Okay.

15              MS. JENNINGS:  I think that's it.  No

16      further questions.

17              MS. VOCCIO:  Just a couple of follow-ups.

18                  REDIRECT EXAMINATION

19  BY MS. VOCCIO:

20      Q.  Did this stress disorder you were diagnosed with

21  limit your activities in any way?

22      A.  Hmm, my activities?  Um, no.

23      Q.  And you had mentioned that, I think, correct me if

24  I'm wrong, that people bid for stations; is that correct?

25      A.  Yes, typically.  Yes.

1      Q.   Okay.  Was that statement ever lifted, to your

2   knowledge?

3      A.   Not to my knowledge.

4      Q.   Did you ever receive a paycheck after that?

5      A.   No, I didn't.

6      Q.   Did you ever have your benefits reinstated?

7      A.   No, I didn't.

8      Q.   Were you able to collect unemployment following the

9   17th of November, 2000?

10      A.   Yes, I did.

11      Q.   Okay.  So for all practical purposes then, you were

12   terminated then, on what date?

13      A.   November 17th.

14      Q.   Okay.

15              MS. JENNINGS:   I think that's it.   No

16          further questions.

17              MS. VOCCIO:   Just a couple of follow-ups.

18                      REDIRECT EXAMINATION

19   BY MS. VOCCIO:

20      Q.   Did this stress disorder you were diagnosed with

21   limit your activities in any way?

22      A.   Hmm, my activities?  Um, no.

23      Q.   And you had mentioned that, I think, correct me if

24   I'm wrong, that people bid for stations; is that correct?

25      A.   Yes, typically.  Yes.

1   A.   Um, I'm thinking it was, basically, the reason for

2   it, you know?  I felt that, you know, that had explained it,

3   you know?  It had explained it for me and, you know, pretty

4   much explained to me that it was problem about anxiety and

5   stress due to the environment I was in, and even still, she

6   wanted to give me some medication for it.  I thought that was

7   kind of silly.

8   Q.   Almost finished here.  November 17th, is that the

9   date of your termination?  What was that year?  2000?  What

10  was the date of your termination?

11  A.   November 17th.

12  Q.   What year?

13  A.   2000.

14  Q.   Okay.

15  A.   I believe.

16  Q.   After that, did you ever receive -- were you ever

17  recalled to work and reinstated in your position?

18  A.   Hmm, I never returned to my position, you know?

19  They --

20  Q.   Okay.  Can you tell me whether or not what were the

21  circumstances, when you were terminated, in terms of your

22  ability to return to the premises?

23  A.   As far as returning to the firehouse, the Town, I

24  was told I would be arrested for trespassing if I was caught

25  anywhere on Town property.

1    Q.   Okay.  Was that statement ever lifted, to your

2  knowledge?

3    A.   Not to my knowledge.

4    Q.   Did you ever receive a paycheck after that?

5    A.   No, I didn't.

6    Q.   Did you ever have your benefits reinstated?

7    A.   No, I didn't.

8    Q.   Were you able to collect unemployment following the

9  17th of November, 2000?

10    A.   Yes, I did.

11    Q.   Okay.  So for all practical purposes then, you were

12  terminated then, on what date?

13    A.   November 17th.

14    Q.   Okay.

15         MS. JENNINGS:  I think that's it.  No

16    further questions.

17         MS. VOCCIO:  Just a couple of follow-ups.

18              REDIRECT EXAMINATION

19  BY MS. VOCCIO:

20    Q.   Did this stress disorder you were diagnosed with

21  limit your activities in any way?

22    A.   Hmm, my activities?  Um, no.

23    Q.   And you had mentioned that, I think, correct me if

24  I'm wrong, that people bid for stations; is that correct?

25    A.   Yes, typically.  Yes.

Q.  Did you have interviews scheduled?

A.  Yes, I did.

Q.  Where?

A.  In West Hartford.

Q.  Where?

A.  I forget the place.  It's a meat distributor.

Q.  Where is it located?

A.  I don't know.  Somewhere in West Hartford.

Q.  You don't remember the name of the place or where it's at?

A.  No, not offhand.

Q.  Did you get the job?

A.  Nope.  Wasn't interested.

Q.  What time was your interview scheduled?

A.  I don't recall.

Q.  Did you try to reschedule the January 24, 2001 hearing?

A.  No, I didn't.  I think after that meeting Dave called me and agreed with my me.  They weren't really looking to negotiate anything.  They were just going to terminate me.  And told me there was a police officer there waiting and so forth, so Dave went to the meeting.

Q.  Did you ever make an appointment with Miss Dube and counsellor with the EAP program?

A.  Mm-hmm.

1    Q.  Did you see Miss Dube?

2    A.  Yes, I did.

3    Q.  When?

4    A.  Couple different occasions.

5    Q.  When?

6    A.  I don't know when.  December 8 or whatever that

7  initial date is, and another occasion.  I had conversations

8  with her.  I didn't see Miss Dube.  I spoke with Miss Dube.

9  I went to see their counsellor, who -- I forget what her name

10  was.  And spoke to several parties about the whole thing.

11    Q.  Was this -- sorry?

12    A.  Selig, Joanne Cannon, Miss Dube and whoever that

13  counsellor is.

14    Q.  And is it your testimony that you saw the counsellor

15  in December 2000?

16    A.  I saw her twice in December.

17    Q.  And you did file a grievance regarding the Town's

18  actions in November 2000; correct?

19    A.  Yes, somebody filed grievances.

20    Q.  What did you grieve?

21    A.  In November?  Of two thousand?

22    Q.  Yes.

23    A.  We initially grieved the termination.

24    Q.  What happened with that grievance?

25    A.  They said, well, you weren't terminated.  They kind

this.  I believe I was terminated, again, already.

Q.  Just so the record's clear, Defendant's Exhibit 15 is a January 19, 2001 letter from Chief Weber.  According to this letter here, the hearing was scheduled for January 24, 2001 in order to determine your employment status with the Town.  Did you learn about that hearing from either Dave Mayer or anyone before January 24, 2001?

A.  They called me on the 22nd, informed me of that meeting.

Q.  And what did they tell you?

A.  He told me about the meeting on the 24th and they wanted to have a meeting on Friday the 24th.  He also mentioned that grievances that had filed had went to, he said, mediation, and were cited in our favor.  I forget exactly what happened, and he said something like, I don't know, three days suspension.  Ended up being one day.  And said, compared to the other grievances, we did better with mine and this than we did with the other ones or something.

Q.  Meaning, grievances from other employees or --

A.  Right, right.  He said we did better with mine than with the other grievances that were on hand.  I told him, you know -- after hearing about the grievances, I told him, well, I asked him, well, what do you mean, mediation?  And he said, that's the end of it or something.  And he explained, well, there was arbitration, too, and you know, but they had

1    side-stepped that or something.  And he asked he me why I

2    wasn't there, and I told him he hadn't told me about it.  And

3    he said, yes, he did so.  Said, no, you didn't.

4            And I told him to take it to the next level, to

5    take it to arbitration.  I wasn't happy with the results of

6    it.  And asked him to take it to the next level.  As far as

7    the meeting on Friday, I told him I wasn't going to be able

8    to make it.  And I told him that and few other things that we

9    discussed, too.

10       Q.  What else did you discuss?

11       A.  Well, I had got a call from a police officer asking

12   to see me.  Wanted to see me on, I don't know, whatever --

13   whatever -- King's birthday was celebrated that year, 14, I

14   believe, January.  And he said, if I didn't come in, I would

15   be arrested and a warrant would be put out for my arrest.

16       Q.  Is that the reason why you couldn't go to the

17   meeting or just something else that you discussed?

18       A.  I told him that.  I told him about the officer and

19   everything and I said, you know, they're not seriously

20   wanting to negotiate, anyways.

21       Q.  All right.  Why didn't you go to the meeting on

22   January 24th?

23       A.  Well, I had other plans that day.

24       Q.  What?

25       A.  I was looking for a job.

1      Q.  Did you have interviews scheduled?

2      A.  Yes, I did.

3      Q.  Where?

4      A.  In West Hartford.

5      Q.  Where?

6      A.  I forget the place.  It's a meat distributor.

7      Q.  Where is it located?

8      A.  I don't know.  Somewhere in West Hartford.

9      Q.  You don't remember the name of the place or where

10    it's at?

11     A.  No, not offhand.

12     Q.  Did you get the job?

13     A.  Nope.  Wasn't interested.

14     Q.  What time was your interview scheduled?

15     A.  I don't recall.

16     Q.  Did you try to reschedule the January 24, 2001

17    hearing?

18     A.  No, I didn't.  I think after that meeting Dave

19    called me and agreed with my me.  They weren't really looking

20    to negotiate anything.  They were just going to terminate

21    me.  And told me there was a police officer there waiting and

22    so forth, so Dave went to the meeting.

23     Q.  Did you ever make an appointment with Miss Dube and

24    counsellor with the EAP program?

25     A.  Mm-hmm.

1    A.   Um, I'm thinking it was, basically, the reason for

2 it, you know?   I felt that, you know, that had explained it,

3 you know?   It had explained it for me and, you know, pretty

4 much explained to me that it was problem about anxiety and

5 stress due to the environment I was in, and even still, she

6 wanted to give me some medication for it.   I thought that was

7 kind of silly.

8    Q.   Almost finished here.   November 17th, is that the

9 date of your termination?   What was that year?   2000?   What

10 was the date of your termination?

11    A.   November 17th.

12    Q.   What year?

13    A.   2000.

14    Q.   Okay.

15    A.   I believe.

16    Q.   After that, did you ever receive -- were you ever

17 recalled to work and reinstated in your position?

18    A.   Hmm, I never returned to my position, you know?

19 They --

20    Q.   Okay.   Can you tell me whether or not what were the

21 circumstances, when you were terminated, in terms of your

22 ability to return to the premises?

23    A.   As far as returning to the firehouse, the Town, I

24 was told I would be arrested for trespassing if I was caught

25 anywhere on Town property.

1    A.  Um, I'm thinking it was, basically, the reason for

2    it, you know?  I felt that, you know, that had explained it,

3    you know?  It had explained it for me and, you know, pretty

4    much explained to me that it was problem about anxiety and

5    stress due to the environment I was in, and even still, she

6    wanted to give me some medication for it.  I thought that was

7    kind of silly.

8    Q.  Almost finished here.  November 17th, is that the

9    date of your termination?  What was that year?  2000?  What

10   was the date of your termination?

11   A.  November 17th.

12   Q.  What year?

13   A.  2000.

14   Q.  Okay.

15   A.  I believe.

16   Q.  After that, did you ever receive -- were you ever

17   recalled to work and reinstated in your position?

18   A.  Hmm, I never returned to my position, you know?

19   They --

20   Q.  Okay.  Can you tell me whether or not what were the

21   circumstances, when you were terminated, in terms of your

22   ability to return to the premises?

23   A.  As far as returning to the firehouse, the Town, I

24   was told I would be arrested for trespassing if I was caught

25   anywhere on Town property.

1    A.  Um, I'm thinking it was, basically, the reason for

2    it, you know?  I felt that, you know, that had explained it,

3    you know?  It had explained it for me and, you know, pretty

4    much explained to me that it was problem about anxiety and

5    stress due to the environment I was in, and even still, she

6    wanted to give me some medication for it.  I thought that was

7    kind of silly.

8    Q.  Almost finished here.  November 17th, is that the

9    date of your termination?  What was that year?  2000?  What

10   was the date of your termination?

11   A.  November 17th.

12   Q.  What year?

13   A.  2000.

14   Q.  Okay.

15   A.  I believe.

16   Q.  After that, did you ever receive -- were you ever

17   recalled to work and reinstated in your position?

18   A.  Hmm, I never returned to my position, you know?

19   They --

20   Q.  Okay.  Can you tell me whether or not what were the

21   circumstances, when you were terminated, in terms of your

22   ability to return to the premises?

23   A.  As far as returning to the firehouse, the Town, I

24   was told I would be arrested for trespassing if I was caught

25   anywhere on Town property.

1      A.   Um, I'm thinking it was, basically, the reason for

2      it, you know?  I felt that, you know, that had explained it,

3      you know?  It had explained it for me and, you know, pretty

4      much explained to me that it was problem about anxiety and

5      stress due to the environment I was in, and even still, she

6      wanted to give me some medication for it.  I thought that was

7      kind of silly.

8           Q.   Almost finished here.  November 17th, is that the

9      date of your termination?  What was that year?  2000?  What

10     was the date of your termination?

11          A.   November 17th.

12          Q.   What year?

13          A.   2000.

14          Q.   Okay.

15          A.   I believe.

16          Q.   After that, did you ever receive -- were you ever

17     recalled to work and reinstated in your position?

18          A.   Hmm, I never returned to my position, you know?

19     They --

20          Q.   Okay.  Can you tell me whether or not what were the

21     circumstances, when you were terminated, in terms of your

22     ability to return to the premises?

23          A.   As far as returning to the firehouse, the Town, I

24     was told I would be arrested for trespassing if I was caught

25     anywhere on Town property.