UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
----------------------------------X
MARCUS H. DIGGS,                   :

     Plaintiff,                    :

              - against -         : No. 3:02CV1628(GLG)
                                    **OPINION**
TOWN OF MANCHESTER,                :
STEVEN WERBNER, Deputy General
Manager, THOMAS WEBER, Fire Chief, :
and ROBERT BYCHOLSKI, Assistant
Fire Chief, in their individual and:
official capacities; and LOCAL
1579 IAFF, DAVID M. MAYER,         :
President,
                                   :
     Defendants.
----------------------------------X

     This eight-count complaint arises out of Plaintiff's

termination as a firefighter with the Town of Manchester.

Defendants, the Town of Manchester, Town Manager Steven Werbner,

Fire Chief Thomas Weber, and Assistant Fire Chief Robert

Bycholski (the "Town Defendants") have now moved for summary

judgment **[Doc. # 15]** on 21 different grounds.  Likewise,

Defendants Local 1579 IAFF and David Mayer, the past-President of

the Local, (the "Union Defendants") have moved for summary

judgment **[Doc. # 24]** on nine grounds.  As discussed below, the

Defendants' motions will be granted.

<u>**Summary Judgment Standard**</u>

     The standard for granting a motion for summary judgment is

well-established.  A moving party is entitled to summary judgment

"if the pleadings, depositions, answers to interrogatories, and

1

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The burden of establishing that there is no genuine factual dispute rests with the moving party.  See Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  In ruling on a summary judgment motion, the Court cannot resolve issues of fact.  Rather, it is empowered to determine only whether there are material issues in dispute to be decided by the trier of fact.  The substantive law governing the case identifies those facts that are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In assessing the record to determine whether a genuine dispute as to a material fact exists, the Court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  Id. at 255;  Matsushita Electric Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## Factual Background

Plaintiff, Marcus H. Diggs, who is African-American, was employed as a firefighter by the Town of Manchester, Connecticut, for 17 years.  Throughout his employment, he was a member of Local 1579 of the International Association of Fire Fighters,

2

IAFF.  (Un. St. ¶ 2.)[1]  The record in this case presents the following chronology concerning Plaintiff's employment history as a firefighter.

Plaintiff commenced his employment as a firefighter with the Town of Manchester on a probationary basis on February 28, 1983. At the time, he was the only black firefighter for the Town of Manchester.  (Pl.'s Dep. at 174.)  His one-year probationary period was extended three months until May 28, 1984, by Chief John C. Rivosa "because of episodes that have occurred during his probation."  (Un. St. ¶ 5.)  At meetings regarding Plaintiff's probationary status, Plaintiff was represented by the Local Union.  (Id.)  On July 5, 1984, Plaintiff was approved for permanent status as a firefighter.  (Un. St. ¶ 6.)

On August 10, 1984, Plaintiff received a warning from Chief Rivosa for poor driving, tardiness, and for an incident in which he used an "off color" remark in a telephone conversation with a member of the public.  The Local represented Plaintiff at the pre-disciplinary sessions.  (Un. St. ¶ 7.)

On September 30, 1984, Plaintiff received a warning from the Chief for failing to report to work on time.  Union member

---

[1]  As used herein, "Un. St. ¶ —" refers to the Union Defendants' Local Rule 56(a)1 Statement in Support of their Motion for Summary Judgment [Doc. # 26].  "Town St. ¶ —" refers to the Town Defendants' Local Rule 56(a)1 Statement [Doc. # 17]. Unless otherwise indicated, each of the facts taken from these statements has been admitted by Plaintiff.

Defendant David Mayer represented Plaintiff at the meeting with the Fire Chief.  (Un. St. ¶ 8.)

Sometime in the mid-80's, Plaintiff filed a written complaint of discrimination with the City against three firefighters, Krabontka, Bajoris, and Dappollonia, who purportedly told Plaintiff that "he'd better keep his mouth shut in the TV room or they would tell the Chief that they couldn't work with this n------."  (Pl.'s Dep. at 26-27.)  Plaintiff states that his complaint was investigated and summarily dismissed.  (Id. at 27.)

On September 16, 1986, Plaintiff was ordered to reimburse the Department for personal phone calls made while on duty.  (Un. St. ¶ 9.)  He also received a written reprimand for failure to report to work.  (Un. St. ¶ 10.)  Dan Huppe, the Local Union Steward, represented Plaintiff at the meeting with Deputy Fire Chief Bycholski.  Plaintiff accepted the discipline relating to the phone calls and did not appeal the discipline relating to his failure to report to work.  (Un. St. ¶¶ 9 & 10.)

On August 18, 1987, Plaintiff was warned about various aspects of his job performance by Deputy Chief Bycholski and was temporarily transferred to another station.  (Un. St. ¶ 11.)

On December 31, 1987, Plaintiff was suspended for one day and was required to reimburse the Department for four hours of overtime for his failure to report to work on December 24th.

4

(Un. St. ¶ 12.)   Plaintiff was represented by Local Steward Huppe.  He did not appeal this discipline.  (Id.)

On January 8, 1988, Plaintiff was suspended for one week for his failure to report to work on January 4, 1988.  He was represented by the Local President Robert Martin and two other Union members.  Plaintiff did not grieve this discipline.  (Un. St. ¶ 13.)

On August 10, 1988, Local 1579 filed a grievance on Plaintiff's behalf regarding a denial of Union representation at a disciplinary meeting.  (Un. St. ¶ 15.)

On August 25, 1988, the Fire Chief suspended Plaintiff for two days for insubordination, charging Plaintiff with directing profanities at his superior officer.  (Un. St. ¶ 16 & Pl.'s Resp. to ¶ 16.)   Plaintiff claims that profanity was used among the firefighters on a daily basis and that white firefighters were not disciplined for similar statements.  Plaintiff disputes whether he received representation from the Union at the disciplinary meeting.  (Pl.'s Resp. to ¶ 16.)   However, on August 29, 1988, Local President Martin filed a grievance alleging that Plaintiff's August 25th discipline was without just cause.  (Un. St. ¶ 17.)   On January 5, 1989, the Local presented his suspension grievance at an arbitration before the State Board of Mediation and Arbitration, which upheld the suspension.  (Un. St. ¶¶ 22 & 24.)

5

On September 28, 1988, Deputy Fire Chief Bycholski observed

Plaintiff displaying "extremely erratic behavior, including

talking to himself, speaking illogically, excessive swearing,

continuous laughing, tossing around objects and occasional

hostility." (Pl.'s Ex. 3, Bycholski Aff. ¶ 7;[2] Pl.'s Ex. 4,

Bycholski 9/28/88 Memo to File of Marcus Diggs[3].)  Plaintiff was

evaluated by a psychologist who, on October 1, 1988,

involuntarily committed Plaintiff to the Institute for Living.

(Un. St. ¶ 18.)  Plaintiff remained hospitalized for a month or

two.  (Pl.'s Dep. at 149.)  On November 30, 1988, Plaintiff

---

[2]  The sworn affidavit of Assistant Chief Bycholski has been separately docketed as Doc. # 19.

[3]  In opposition to Defendants' Motions for Summary Judgment, Plaintiff has submitted a number of exhibits that are letters or memoranda written by other Fire Department personnel. These appear to have come from Plaintiff's personnel file.  These documents have not been objected to by Defendants on grounds of hearsay, lack of proper authentication, or otherwise.  In fact, many of the same documents have been submitted by Defendants. While normally the Court is not permitted to consider hearsay evidence or otherwise inadmissible evidence in ruling on a motion for summary judgment, see Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999), in this case, because these documents have been submitted by the non-moving party and because Defendants have not objected to their consideration, the Court has considered them in ruling on the motions for summary judgment. See 11 Moore's Federal Practice § 56.14[2][c] (3d ed. 2003); DeCintio v. Westchester County Medical Ctr., 821 F.2d 111, 114 (2d Cir.), cert. denied, 484 U.S. 965 (1987); H. Sand & Co. v. Airtemp Corp., 934 F.2d 450, 454-55 (2d Cir. 1991); Perez v. Alcoa Fujikura, Ltd., 969 F. Supp. 991, 998 (W.D. Tex. 1997).  The Court would note, however, that for the most part these documents were used to fill in gaps in the factual background, and none was critical to the disposition of these motions.

returned to work after meeting with Fire Chief Rivosa.  He was
represented in that meeting by Local President Martin.  (Un. St.
¶ 19.)  However, the next day, December 1, 1988, Plaintiff failed
to report for his scheduled shift and eventually showed up 50
minutes late.  Chief Rivosa extended Plaintiff's previous one-
year probation for failure to report until January 10, 1990.
Plaintiff was represented by the Local and did not grieve the
extended probation.  (Un. St. ¶ 20.)

On January 23, 1989, Plaintiff filed a complaint of
discrimination based on race with the Connecticut Commission on
Human Rights and Opportunities ("CCHRO") against the Town of
Manchester Fire Department.  (Un. St. ¶ 21; Un. Ex. D.)  This
complaint was dismissed by the CCHRO on January 16, 1990, and on
May 16, 1990, the Equal Employment Opportunity Commission
("EEOC") issued its finding of no reasonable cause.  (Un. St. ¶¶
23 & 25; Un. Ex. D.)

On August 24, 1990, Plaintiff received a written reprimand
for being absent without leave.  He was represented at the
disciplinary meeting by Local President Martin and elected not to
grieve the discipline.  (Un. St. ¶ 26.)

On August 17, 1991, Plaintiff filed a grievance charging the
Fire Department with unjust discipline.  (Un. St. ¶ 27.)  The
grievance was settled with the Fire Chief's granting Plaintiff's
requested relief.  Plaintiff was again represented at the

grievance meeting by Local President Martin.  (Un. St. ¶ 28.)

On July 11, 1994, Plaintiff was involved in a verbal altercation with a fellow firefighter, John Tsokalas, who suggested that Plaintiff might be a racist based upon certain derogatory comments Plaintiff made about "white people."  (Pl.'s Ex. 5.)  The conversation became quite heated and Plaintiff suggested they meet in the park after work "to discuss this further."  (Tsokalas claims that Plaintiff said, "We'll go to the park in an hour and I'll show you who's a racist.  I'll kick you're a---.  I'll f------ kill you.") (Pl.'s Ex. 5 & Pl.'s Dep. at 22.)  At that point, Tsokalas lifted a chair over his head and slammed it to the ground, breaking one of the legs.  (Id. at 22-23.)  Tsokalas states that he and Plaintiff shouted profanities at each other, and Plaintiff threatened him several more times.  (Pl.'s Ex. 5.)  Tsokalas then called headquarters. (Id.; Pl.'s Dep. at 23.)  Another firefighter was sent to the station to relieve Plaintiff for the last few minutes of his shift.  (Id.)  Firefighter Tsokalas provided the Fire Chief with a written account of the incident (Pl.'s Ex. 5), to which Plaintiff responded.  After an investigation, Fire Chief Rivosa concluded that Plaintiff provoked other employees into arguments and asked Plaintiff to speak with the Town Nurse.  The Chief advised him that no further provocation on his part would be tolerated.  "If this problem continues to exist and I find that

you are at fault, you leave me no other alternative but to reassign you to Headquarters." (Pl.'s Ex. 6, Rivosa 7/27/94 Ltr. to Diggs.)

On August 7, 1995, Plaintiff was involved in a shouting match with another firefighter, Mark Lupachino, after Plaintiff had answered a telephone call from Lupachino's wife and either dropped or slammed the phone receiver on the desk. (Pl.'s Ex. 12.) Plaintiff and Lupachino exchanged profanities. Lupachino called headquarters and complained that Plaintiff had threatened him. (Pl.'s Ex. 7, Memo from Bycholski dtd. 8/7/95 to Rivosa.) Two deputy chiefs, Hughes and Bycholski, responded to the station and found Plaintiff in an agitated state and yelling profanities. Plaintiff was relieved of his duty that day, with pay, and reassigned to another station where he could receive more supervision given his history of being uncordial to the public and verbal abuse of other firefighters. (Pl.'s Ex. 12.) Two days later, Plaintiff consulted with a psychologist, whom he told that he "fear[ed] for his physical safety" and that he was "concerned about his volatile temper." Plaintiff was placed on medical leave at the direction of his psychiatrist, who diagnosed him as suffering from "work related stress disorder." (Pl.'s Ex. 3, Bycholski Aff. ¶ 10; Pl.'s Dep. at 185.) On August 14, 1995, the Union filed a grievance against the Fire Department on Plaintiff's behalf alleging harassment and that Plaintiff had

been suspended without just cause.  (Un. St. ¶ 30.)  Plaintiff
remained out of work under the care of his psychiatrist until
October 17, 1995.  (Town Ex. I.)

On June 18, 1997, Plaintiff was again warned by the Fire
Chief about making personal long-distance calls from his
workstation.  (Un. St. ¶ 31.)  On May 20, 1998, Plaintiff
received a written reprimand.  He declined Union representation
twice and did not initiate a grievance.  (Un. St. ¶ 33.)

On November 8, 1997, Plaintiff was warned about vulgar and
profane communications with a fellow firefighter.  Plaintiff was
represented by a Local representative in connection with this
matter.  (Un. St. ¶ 32.)

On July 1, 1998, Plaintiff received a written reprimand for
failure to report to work on time.  Plaintiff declined Union
representation and did not file a grievance.  (Un. St. ¶ 34.)

On May 25, 1999, another verbal altercation occurred between
Plaintiff and firefighter Eric Borden.  According to Plaintiff,
he tried to give Borden a memo as Plaintiff was leaving work.
Borden was not interested in it and walked away.  Plaintiff
cursed at Borden.  Plaintiff then attempted to reach around
Borden to retrieve a tape from his truck.  Borden claims that
Plaintiff "got in his face" and touched him, which Plaintiff
denies.  (Pl.'s Dep. at 106-08.)  Plaintiff claims that Borden
was the aggressor.  (Id.)  Borden filed a formal complaint

claiming that Plaintiff was yelling and pushing him.  (Pl.'s Ex. 8, Memo dtd. 5/25/99 from Borden to Hughes.)  The Town investigated the incident but could not determine what had happened and no disciplinary action was taken against either firefighter.  (Bycholski Aff. ¶ 11.)

In September 1999, there was an altercation between Plaintiff and a Connecticut State Trooper at the scene of a motor vehicle accident.  The State Trooper made a complaint against Plaintiff for disobeying a police order.  Fire Chief Weber issued Plaintiff a written warning.  (Pl.'s Dep. at 78-79.)

On September 13, 1999, Plaintiff received a letter of reprimand for failing to complete his scheduled work shift and failing to report to accepted overtime.  Plaintiff was represented by the Union and was successful in having this letter of reprimand removed from his personnel file.  (Un. St. ¶ 35.)

On March 7, 2000, Chief Weber issued Plaintiff a written reprimand for violence in the workplace.  (Pl.'s Ex. 9.)  The shift commander had reported that Plaintiff, while at the station, had remarked that he could kill 67 firefighters and get away with it and that he was going to buy a gun.  (Pl.'s Ex. 3, Bycholski Aff. ¶ 13.)  When approached by an officer about his comments, Plaintiff responded that he was responding to another firefighter's comments about layoffs, and that he was joking about the fact that 65 or more people would have to get laid off

before he could be terminated.  (Pl.'s Ex. 9 & Pl.'s Dep. at 56.)
The Union filed a grievance on Plaintiff's behalf, complaining
that Plaintiff had been reprimanded for a statement made jokingly
to another firefighter. (Pl.'s Ex. 10.)  The reprimand was
subsequently withdrawn by Union agreement in order to implement
workplace violence training.  (Id.)

On March 10, 2000, Plaintiff reported violent comments
allegedly made by Lieutenant John Fusco to two firefighters.  The
incident was investigated but no formal action was taken.  The
investigating officer spoke with the two attendants to whom
Fusco's alleged threat was made.  They stated that they perceived
the remarks as funny and enjoyed them as a joke.  (Pl.'s Ex. 11 &
13.)

On March 12, 2000, Plaintiff was reported for screaming at
several construction workers who, while working at the fire
station, had parked their truck in front of Plaintiff's fire
engine.  Plaintiff reportedly yelled that "someone was going to
die."  (Pl.'s Ex. 14.)  Plaintiff states that was "not what I
screamed.  I told them they were putting lives at stake, that
people could die because of this . . . Like when I got to go, I
got to go.  You can't park in front of my truck."  (Pl.'s Dep. at
62.)  The construction workers did not want to pursue a formal
complaint and, therefore, no disciplinary action was taken
against Plaintiff.  Deputy Chief MacDonald, however, reported the

12

incident to Chief Weber and Assistant Chief Bycholski, expressing his concern that Plaintiff was experiencing "mental or emotional distress that could lead to a catastrophic situation" and that Plaintiff was in need of "immediate psychiatric help and [was] not presently fit for duty."  (Pl.'s Ex. 14.)

On May 16, 2000, Plaintiff received a three-day suspension for insubordination and abusive language toward a superior officer, Captain Burford.  (Pl.'s Dep. at 45; Pl.'s Ex. 15.) Plaintiff denies having called her a "slut" but admits that he gave her an evasive answer when she questioned him concerning the whereabouts of his partner.  (Pl.'s Dep. at 45.)  After a disciplinary hearing at which Plaintiff was represented by the Union, his suspension was ultimately reduced to one day by agreement.  Plaintiff did not grieve the suspension.  (Un. St. ¶ 37.)

In July 2000, Chief Bycholski received reports that Plaintiff had displayed inappropriate conduct and had been driving at excessive rates of speed, running red lights to get to calls.  (Pl.'s Ex. 3, Bycholski Aff. ¶ 17; Pl.'s Ex. 16, 17 & 18.)  In September, there was another report of Plaintiff's erratic driving and his unwillingness to participate during medical responses.  (Pl.'s Ex. 19, 20 & 21.)  On October 16, 2000, Plaintiff received a letter of reprimand for "inattentive operation of [his] apparatus on September 14, 2000" and a two-day

suspension as a result of his failure to attend to a patient and for use of profane language at the scene.  The Local filed a grievance on Plaintiff's behalf, claiming discipline without just cause.  (Un. St. ¶¶ 38 & 39.)  On November 9, 2000, both of Plaintiff's October 16th grievances were denied.  (Un. St. ¶ 41.)

On October 19, 2000, Plaintiff filed a complaint and affidavit of illegal discrimination with the CCHRO against the Town of Manchester, alleging discrimination on the basis of race. More specifically, he alleged that, because of his race, he was poorly evaluated on May 16, 2000, and October 16, 2000,[4] he was sexually harassed on May 16, 2000,[5] he was suspended on May 16, 2000, and October 16, 2000, he was harassed on May 16, 2000, and September 14, 2000, he was warned on October 1, 2000, and he was retaliated against in 1995, 1998, 1999, and 2000.  (Un. St. ¶ 40; Un. Ex. I.)

In November 2000, the Fire Department received two complaints from female ambulance attendants and a female volunteer firefighter regarding incidents where Plaintiff was abusive and used inappropriate language.  Assistant Chief Bycholski did not have an opportunity to investigate these allegations.  (Pl.'s Ex. 3, Bycholski Aff. ¶ 19.)

---

[4]  Presumably this refers to the reprimands discussed above. No other "evaluations" are not part of the record.

[5]  This refers to the incident with Captain Burford.

On the evening of November 16, 2000, Plaintiff, while off-duty, came to Station 4 for a union meeting, which was cancelled allegedly for lack of a quorum.  Plaintiff left but then returned to Station 4 to post a joke that he had found at home.  Plaintiff and firefighter Talbot exchanged words concerning a racial remark that Plaintiff claimed Talbot had made several years earlier about "how he never saw a black man work so hard since the end of slavery."  Talbot told Plaintiff that he could not recall having made this remark, after which Plaintiff became upset and accused Talbot of being like "all the rest."  Plaintiff said that he would "have all of [their] heads."  (Pl.'s Dep. at 111.)  Talbot reported the incident to the Executive Board and, at their suggestion, reported the incident to the Lieutenant on duty.  After Talbot expressed concern for his safety, Bycholski instructed Deputy Chief Hughes to move Talbot and the other firefighter to another station for the remainder of the night.  (Pl.'s Ex. 3, Bycholski Aff. ¶ 20.)  This was the first time in the history of the Department that a station had to be closed.  (Id.)

The following day, Bycholski reviewed Plaintiff's personnel file and then held a meeting[6] with Plaintiff to discuss his violations of the Department's Violence in the Workplace Policy.

---

[6]  The Town Defendants characterize this as a pre-termination meeting.

15

(Pl.'s Ex. 3, Bycholski Aff. ¶ 20.)  A number of incidents were discussed.  (Pl.'s Dep. at 119-120.)  Plaintiff was represented by Local President Mayer and Union Representative Lupacchino, although Plaintiff notes that there were a number of discussions between the Union and Town outside of Plaintiff's presence.

The Town presented Plaintiff with a "last chance agreement," which provided that in lieu of termination, Plaintiff would receive a five-day suspension subject to the following conditions:  Plaintiff would agree to a fitness for duty evaluation by a psychiatrist and/or psychologist of the Town's choosing and Plaintiff would sign all necessary releases to allow the Town access to the results of this examination. Additionally, Plaintiff agreed to see a counselor associated with the Town's Employment Assistance Program ("EAP") and attend follow-up counseling sessions, if necessary.  The Town reserved the right "in its sole discretion and for any reason during the remainder of [Plaintiff's] employment with the Town," if the Town had any concerns associated with Plaintiff's behavior or his ability to perform the required duties of firefighter, or as a result of the Town's evaluation of his fitness for duty report, to immediately terminate his employment with the Town.  If Plaintiff's employment were terminated, Plaintiff would have no right to appeal that termination through the grievance process or to file a claim with any administrative agency.  Until the Town

16

received Plaintiff's fitness for duty evaluation, Plaintiff was placed on an unpaid leave of absence and was prohibited from visiting any Town facility.  (Town Ex. BB.)

Because the agreement waived Plaintiff's future grievance and arbitration rights, the Union refused to sign it.  Plaintiff signed the agreement, allegedly under duress and with the understanding that as long as the Union did not sign the agreement, it would not be binding.  (Pl.'s Dep. at 118-19.) Plaintiff testified that "it was something that I couldn't see agreeing to; so we decided that . . . we'd give them my signature as long as the Union couldn't sign it, and leave the next move up to Bycholski."  (Pl.'s Dep at 122-23.)

Plaintiff claims that he was terminated on November 17, 2000.  Whether he was actually terminated on that date is disputed by Defendants.  Assistant Chief Bycholski states that termination was discussed but never finalized.  (Pl.'s Ex. 3, Bycholski Aff. ¶ 22.)  However, on that day, David Mayer did escort Plaintiff to his locker to retrieve his personal belongings.  Plaintiff also received unemployment compensation (although the Town objected to this on the ground that he was not terminated), and he was never reinstated as a firefighter.  He was never allowed to return to the firehouse and was told that, if he did return, he would be arrested.

On November 21, 2000, Assistant Chief Bycholski attempted to

send Plaintiff a certified letter (Pl.'s Ex. 29), stating that
while it was his strong belief that the totality of Plaintiff's
actions justified termination proceedings, he was willing to
adjust the disciplinary actions to allow for a continuation of
Plaintiff's employment conditioned upon the terms set forth
above.  (Pl.'s Ex. 29.)  Should Plaintiff fail to comply with any
of these conditions, his employment would be terminated
immediately. (Id.)  Plaintiff refused to accept delivery of this
letter.  On November 28, 2000, Assistant Chief Bycholski had a
second letter hand-delivered to Plaintiff restating the same
conditions, but extending some of the deadlines slightly.  (Pl.'s
Ex. 28.)

    Despite what he claims to be his "termination," Plaintiff
did see the Town's psychiatrist, Dr. Selig, for an initial
fitness for duty evaluation but he never returned for follow-up.
Dr. Selig also was never able to obtain all of Plaintiff's
psychiatric records because he was unable to obtain the necessary
authorizations from Plaintiff.  (Pl.'s Dep. at 136-37, 145-46.)

    Finally, the Fire Chief sent Plaintiff a letter requesting
him to attend a hearing on January 24, 2001, to discuss his
future employment status.  The letter advised him that the
absence of the requested medical information and/or his failure
to attend the EAP program could lead to his termination.
Plaintiff did not receive the letter until after the hearing

18

date, although on January 22nd, he did learn of the hearing from
David Mayer, President of the Local.  Plaintiff, however, did not
attend. (Pl.'s Ex. 3, Bycholski Aff. ¶ 26.)

On January 25, 2001, the Fire Chief sent Plaintiff a letter,
terminating his employment for failure to complete the fitness
for duty evaluation and failure to sign an authorization for the
release of his psychiatric records.

On December 19, 2000, Plaintiff amended his original CCHRO
complaint against the Town to add a claim that he had been
retaliated against due to the filing of his original complaint,
which led to his termination on November 17, 2000.  (Un. St. ¶
47; Un. Ex. I.)  On March 27, 2001, Plaintiff filed another
complaint and affidavit of illegal discriminatory practices
against the Town for retaliation and discharge on January 25,
2001, based on race and the Town's perception that Plaintiff
suffered from a mental disorder.  (Un. St. ¶ 50; Un. Ex. I.)

On November 21, 2000, the Union filed termination
grievances on behalf of Plaintiff, and on November 30, 2000, the
Union filed four additional grievances concerning his suspension
without pay.  On May 14, and May 24, 2001, the Local presented
Plaintiff's suspension grievances at arbitration proceedings
before the State Board of Mediation and Arbitration.  (Un. St. ¶
51.)  Hearings were held on January 18, and May 12, 2002. (Un.
St. ¶ 52.)  Plaintiff was again represented by the Union.  On

19

April 2, 2002, the State Board rendered its decision and award, upholding Plaintiff's suspension.  (Un. St. ¶ 53; Un. Ex. G.)  On May 5, 2003, the State Board rendered its decision regarding the arbitrability of Plaintiff's termination grievance rulings, finding that they were arbitrable.  (Un. St. ¶ 54; Un. Ex. H.) The termination grievance remains pending before the State Board of Mediation and Arbitration, and the Local continues to represent Plaintiff in this matter.

To date, Plaintiff has not filed a complaint of discrimination against the Local.  (Un. St. ¶ 57.)

On June 18, 2002, Plaintiff received a right-to-sue letter from the EEOC.  On September 16, 2002, Plaintiff filed the instant lawsuit.

Pursuant to the Town Charter, the general manager is the highest policymaking official for the Town.  The Fire Chief is charged with the administration and discipline of the Fire Department under the direction of the Town's general manager. (Town Ex. LL ¶¶ 10-12.)

The Town of Manchester has a policy against discrimination, of which Plaintiff was aware.  (Pl.'s Dep. at 105.)  The only discrimination complaint filed by Plaintiff with the Town pertained to the incident that occurred in the mid-1980's with fellow firefighters, Kravontka and Bajoris.  (Pl.'s Dep. at 25-28, 105.)

20

## Discussion

In Counts One, Two, and Three, Plaintiff alleges race discrimination, retaliation, and harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. Counts Four and Five are brought under 42 U.S.C. § 1983 and § 1985, respectively, and allege a deprivation of Plaintiff's right to equal protection and a conspiracy by Defendants to interfere with Plaintiff's civil rights. In Count Six, Plaintiff alleges that Defendants discriminated against him and retaliated against him because of his disability, in violation of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973. Counts Seven and Eight are common-law claims for intentional infliction of emotional distress and negligent infliction of emotional distress. All counts are asserted against all Defendants.

## A.  Claims against the Town Defendants

### 1.  Discrimination and Retaliation Claims Against the Individual Defendants Under Title VII, ADA, and Rehabilitation Act

Title VII prohibits an "employer" from discharging an individual or otherwise discriminating with respect to the employee's compensation, terms, conditions or privileges of employment, because of that individual's race or color. 42 U.S.C. § 2000e-2(a). Similarly, it is an unlawful employment practice for a labor organization to discriminate against any

individual because of his race or color.  42 U.S.C. § 2000e-2(c).
The critical issue with respect to Plaintiff's Title VII claims
against the Town's General Manager, the Fire Chief, Assistant
Fire Chief, and President of the Local Union is whether, as a
matter of law, individuals can be held personally liable as an
"employer" or a "labor organization" for discriminatory conduct
under Title VII.

While some Circuits have chosen to allow liability, the
Second Circuit has unambiguously denied it.  The Court in Tomka
v. Seiler Corp., 66 F.3d 1295, 1313-17 (2d Cir. 1995)(abrogated
on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S.
742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775
(1998)), addressed this issue in detail and held that individual
defendants with supervisory control over a plaintiff may not be
held personally liable under Title VII.  See also Wrighten v.
Glowski, 232 F.3d 119, 120 (2d Cir. 2000); Cook v. Arrowsmith
Shelburne, Inc., 69 F.3d 1235, 1241 (2d Cir. 1995); Shephard v.
Frontier Communications Services, 92 F. Supp. 2d 279, 287
(S.D.N.Y. 2000) ("Tomka and the language of Title VII compel a
holding that only employer-entities have liability under Title
VII"); Nadimi v. Brown, No. 3:99CV1305(GLG), 2000 WL 133735, at
*1 (D. Conn. Jan. 26, 2000) (holding that Tomka includes persons
with supervisory control among those who may not be held
personally liable under Title VII).  Accordingly, Plaintiff's

22

Title VII claims in Counts One, Two, and Three against Werbner, Weber, Bycholski, and Mayer are dismissed as a matter of law.

        This reasoning is equally applicable to claims under the ADA and Rehabilitation Act against the individual Defendants.  The ADA's prohibition against discrimination is limited to employers, employment agencies, labor organizations, and labor-management committees.  42 U.S.C. § 12111(2).  The Rehabilitation Act applies only to programs and activities receiving Federal financial assistance.  29 U.S.C. § 794(a).  Neither statute provides for individual liability.  See Hiler v. Brown, 177 F.3d 542, 545 (6th Cir. 1999) (applying Title VII's definition of "employer" to a retaliation claim under Rehabilitation Act); Huck v. Mega Nursing Servs., Inc., 989 F. Supp. 1462 (S.D. Fla. 1997); Cerrato v. Durham, 941 F. Supp. 388, 395 (S.D.N.Y. 1996); Candelaria v. Cunningham, No. 98 Civ. 6273, 2000 WL 798636, at *2 (S.D.N.Y. June 20, 2000) (no individual liability under Title II of the ADA or the Rehabilitation Act); Bliss vs. Rochester City School District, 196 F. Supp. 2d 314, 338-39 (W.D.N.Y. 2002); Winokur v. Office of Court Admin., 190 F. Supp. 2d 444, 449-50 (E.D.N.Y. 2002) (dismissing ADA claims against defendant in his individual and official capacities); Boise v. Boufford, 127 F. Supp. 2d 467, 472 (S.D.N.Y. 2001) (holding that individual supervisors may not be held personally liable under the ADA); Menes v. CUNY, 92 F. Supp. 2d 294, 306 (S.D.N.Y. 2000) (holding

that individual defendants may not be held personally liable
under the ADA); see also EEOC v. AIC Sec. Investigations, Ltd.,
55 F.3d 1276, 1279-80 (7th Cir. 1995) (noting that ADA and Title
VII statutes are very similar and that "[c]ourts routinely apply
arguments regarding individual liability to all three statutes
interchangeably").  Therefore, Plaintiff's claims against the
individual Defendants asserted in Count Six are dismissed as a
matter of law.

### 2.  Title VII Race Discrimination Claims Against the Town

Plaintiff raises three distinct Title VII claims against the
Town – disparate treatment because of his race, racial
harassment, and hostile work environment.

#### a.  Disparate Treatment

In Count One, Plaintiff alleges that the Town (and others)
discriminated against him because of his race in violation of
Title VII.  His claim is based on a theory of disparate
treatment, which is analyzed under the burden-shifting test of
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  In order
to make out a prima facie case of discrimination under Title VII,
Plaintiff must show that he was (1) a member of a protected
class; (2) qualified for the job; (3) suffered an adverse
employment action; and (4) the adverse employment action occurred
under circumstances giving rise to an inference of
discrimination.  Stern v. Trustees of Columbia Univ., 131 F.3d

24

305, 311-12 (2d Cir. 1997); Shumway v. United Parcel Serv., Inc.,
118 F.3d 60, 64 (2d Cir. 1997).  Plaintiff bears the burden of
offering enough evidence to create an inference that an
employment decision was based on an illegal discriminatory
criterion.  International Brotherhood of Teamsters v. United
States, 431 U.S. 324, 358 (1997).  Once Plaintiff meets his prima
facie burden, the employer then must articulate a non-
discriminatory reason for its actions.  Abdu-Brisson v. Delta
Airlines, 239 F.3d 456, 459 (2d Cir. 2001).  After the employer
has articulated a non-discriminatory reason for the challenged
employment action, the presumption of discrimination vanishes and
the burden shifts back to Plaintiff to come forward with evidence
that the employer's proffered explanation was merely pretextual
and that the actual motivation was more likely than not
discriminatory.  Id.; see Schnabel v. Abramson, 232 F.3d 83, 90
(2d Cir. 2000) (adopting a case-by-case approach to determine
whether a discrimination plaintiff has satisfied his ultimate
burden of persuading the trier of fact that the defendant
intentionally discriminated against the plaintiff, and rejecting
any categorical rule requiring a discrimination plaintiff to
offer, in addition to the prima facie case, further evidence that
discrimination was the actual motivation).

    There is no question that Plaintiff is a member of a
protected class and that he suffered an adverse employment

action.  For purposes of this motion, the Court will also assume
that Plaintiff was qualified to be a firefighter, a job that he
had performed for 17 years, although the Court recognizes that at
the time of his termination there was at least a question as to
his fitness for duty, a matter that was never conclusively
resolved.  The more difficult question is whether Plaintiff has
provided evidence that his termination occurred under
circumstances giving rise to an inference of discrimination.  An
inference of discrimination may arise if Plaintiff can show that
he was treated differently than similarly situated employees of a
different race.  <u>Shumway</u>, 118 F.3d at 63.[7]

Assuming that Plaintiff can meet his prima facie burden, the
Town has proffered a non-discriminatory reason for its actions -
Plaintiff's violation of its violence in the workplace policy and
his failure to meet the stated conditions for his continued
employment.[8]  <u>See</u> <u>Clark v. Runyon</u>, 218 F.3d 915, 918 (6th Cir.

_____

[7]  We recognize that this is not the only way in which a
Title VII plaintiff can meet this burden.  <u>See</u> <u>Abdu-Brisson</u>, 239
F.3d at 468.  Here, however, Plaintiff advances no other proof of
disparate treatment from which an inference of discrimination may
be drawn.

[8]  Plaintiff and Defendants argue extensively about whether
Plaintiff was terminated on November 17, 2000, or on January 25,
2001.  For purposes of ruling on this motion, we need not resolve
this issue.  To the extent that Plaintiff was terminated on
November 17th, there was at least some ongoing relationship
between the Town and Plaintiff as evidenced by Plaintiff's
meeting with the Town psychiatrist.  However, as Plaintiff points
out, he never returned to work after that date and did collect
unemployment compensation.

2000) (finding that actual violence against fellow employees and
threats of violence were legitimate reasons for terminating an
employee).[9]  Plaintiff maintains that these reasons were clearly
pretextual as reflected by the Town's allegedly differential
treatment of other white firefighters.  Thus, Plaintiff relies on
the same differential treatment of other white firefighters to
prove pretext as he does to establish his prima facie case.

Plaintiff also argues, somewhat paradoxically, that his
alleged willful misconduct, failing to complete the fitness for
duty evaluation and to comply with the conditions for continued
employment  occurred <u>after</u> November 17, 2000, (the date on which

---

[9]  In <u>Clark</u>, the plaintiff, who was African-American, was
terminated as a mail clerk with USPS for violations of the USPS
anti-violence policy, known as the "zero-tolerance" policy.  The
termination was a direct result of an altercation that the
plaintiff had with white employees on March 27, 1996.  The
plaintiff had a long history of problems with USPS, including an
involuntary hospitalization by her own psychiatrist after she
verbally and physically assaulted a number of her co-workers.
She had also been disciplined for throwing a package at a fellow
USPS employee, threatening another with bodily harm, and punching
a fellow employee.  Prior to her termination, the plaintiff was
advised that no further violations of the anti-violence policy
would be tolerated.  Not heeding that warning, the plaintiff
engaged in a heated argument with a co-worker, threatening her
with bodily harm.  She was then terminated.  The plaintiff then
filed a Title VII suit alleging race and sex discrimination.  The
Eighth Circuit affirmed the trial court's grant of judgment as a
matter of law on the ground that the plaintiff had failed to
demonstrate a prima facie case of discrimination because she
could not show that she was treated more severely than similarly
situated white employees or, alternatively, that she had not
shown that the reason being offered for her termination – her
lengthy record of violence and threats – was a pretext for firing
her for a prohibited reason.

he claims he was terminated), and, thus, these could not be the reasons for his termination. Plaintiff asserts, "[t]he Town cannot . . . terminate Plaintiff a second time for willful misconduct, when in fact, he was not an employee of the Town of Manchester." (Pl.'s Mem. at 11.) We do not find this argument persuasive. To the extent that Plaintiff claims his termination was on November 17th, then the non-discriminatory reason advanced by the Town for his termination was his violation of the Town's violence in the workplace policy. If the Court accepts the Town's termination date of January 25th instead, then the additional reasons proffered by the Town come into play – Plaintiff's failure to complete the fitness for duty evaluation and to comply with the conditions imposed by the Town on his continued employment. With either date, Plaintiff must produce sufficient evidence to create a genuine issue of triable fact that these non-discriminatory reasons were pretextual.

The record before the Court reflects that Plaintiff had a long history of disciplinary actions relating to verbal altercations with other firefighters and his threatening behavior. On two separate occasions, that behavior actually led to his receiving psychiatric care and, at the time of his termination, he was in the process of being re-evaluated by Dr. Selig. In the months leading up to Plaintiff's termination, his behavior had grown progressively more violent. In March of 2000,

two incidents were reported in which Plaintiff had remarked that
he could kill 67 firefighters and get away with it, although
Plaintiff claims this was just a joke about his job security in
case of layoffs.  In another incident, he yelled at construction
workers words to the effect that someone was going to die, which
he claims was a remark made while he was attempting to follow a
safety directive.  In May, he was accused of being verbally
abusive and insubordinate to a female officer, a claim he again
denies.  In July and September, he was twice reported for erratic
driving.  In November, he was reported for abusive and
inappropriate behavior toward female ambulance attendants.
Finally, on November 16th, he was involved in another altercation
with a firefighter over racist comments allegedly made years
before, which led to his threatening that he would have all of
their heads.  When the record is viewed in its entirety, a clear
pattern of escalating disciplinary problems emerges, all leading
up to Plaintiff's termination.

    None of the other firefighters, whom Plaintiff claims were
treated differently, were similarly situated to Plaintiff in all
material respects.  Plaintiff claims that the Town had a "zero
tolerance" policy for violence in the workplace and that he was
disciplined for things for which white firefighters were not
disciplined.  He cites to his complaints about firefighter Fusco
and firefighter Tsokalas, who were not disciplined for their

alleged violations of the Town's violence in the workplace
policy.  However, with respect to the Fusco incident, the Town
investigated and was told by the medics to whom the comments were
directed that they thought it was a joke.  (Town's Ex. B, N & O.)
With respect to the Tsokalas incident, no formal disciplinary
action was taken against either Plaintiff or Tsokolas.  (Town's
Ex. B & E.)  Thus, Tsokolas was not treated differently than
Plaintiff.  Moreover, this incident occurred in 1994, more than
six years prior to Plaintiff's termination and, thus, has little
relevance to the issue of whether Defendants' proffered reasons
for Plaintiff's termination were pretextual or whether
Plaintiff's termination occurred under circumstances giving rise
to an inference of discrimination.  Additionally, there is no
evidence that either Fusco or Tsokalas had a history of
threatening and abusive behavior similar to that for which
Plaintiff was disciplined repeatedly over his 17 years with the
Fire Department and for which he received psychiatric treatment.

Although Plaintiff categorically alleges that he was
subjected to a "strict level of scrutiny" because of his race, he
has provided no evidence to support his claim that other
similarly situated white firefighters were not subjected to this
same level of scrutiny and review.  He claims that he received
written reprimands and sanctions based on reports from co-workers
to his superiors, which were different similarly situated white

firefighters received, yet he has failed to provide any evidence
to support this claim.

Thus, the Court finds that Plaintiff has failed to carry his
burden of proving that there were other white firefighters,
similarly situated to Plaintiff who were treated differently than
Plaintiff.  See Shumway, 118 F.3d at 64 ("To be 'similarly
situated,' the individuals with whom [the plaintiff] attempts to
compare herself [or himself] must be similarly situated in all
material respects.") (emphasis added).  Additionally, to the
extent that Plaintiff relies on the alleged falsity of the Town's
proffered reasons for his discharge – that he refused to complete
the fitness for duty evaluation and failed to sign an
authorization for the release of his psychiatric records – he has
produced no evidence whatsoever to support his claim that these
reasons were false.  The only evidence that Plaintiff has
provided to refute the legitimacy of these proffered reasons is
that he did sign an authorization allowing Dr. Selig access to
the records of Dr. Cannon, (Pl.'s Ex. 12), but this did not cover
all psychiatric records, as Dr. Selig had requested.
Additionally, Plaintiff claims that he complied with the Last
Chance Agreement by seeing a counselor with the EAP program on
more than one occasion.  Nevertheless, Plaintiff does not dispute
the fact that he never completed his fitness for duty evaluation.

Having reviewed the record in its entirety, we conclude that

31

there are no genuine issues of material fact that the reasons
proffered by the Town for Plaintiff's termination were
pretextual, and we grant summary judgment in favor of the Town on
Count One of Plaintiff's Complaint.

### b.  Retaliation

Plaintiff has also asserted that his termination was in
retaliation for his filing a charge of discrimination with the
EEOC.[10]  Relying on the proximity in time between the filing of
his charge of discrimination and the date of his termination in
November, 2000, Plaintiff argues that there are sufficient facts
to enable a fact finder to infer a causal connection between
Plaintiff's discrimination complaints and the Department's
termination of him.  (Pl.'s Mem. at 12-13.)

Title VII prohibits an employer from retaliating against an
employee because he "has opposed any practice made an unlawful
employment practice by this subchapter, or because he has made a
charge, testified, assisted, or participated in any manner in any
investigation, proceeding, or hearing under this subchapter."  42
U.S.C. § 2000e-3(a).  Title VII is violated when "a retaliatory
motive plays a part in adverse employment actions toward an
employee, whether or not it was the sole cause."  Cosgrove v.

---

[10]  Plaintiff filed an earlier charge of discrimination with
the CCHRO, in 1989, involving primarily claims that Deputy Chief
Beckwith had been overly critical of Plaintiff's work.  Plaintiff
states that after he filed the complaint, Beckwith quit harassing
him for the most part.  (Pl.'s Dep. at 18.)

Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993).  "To
establish a prima facie case of retaliation, a plaintiff must
show (1) participation in a protected activity known to the
defendant; (2) an employment action disadvantaging the plaintiff;
and (3) a causal connection between the protected activity and
the adverse employment action."  Quinn v. Green Tree Credit
Corp., 159 F.3d 759, 769 (2d Cir. 1998) (internal citations and
quotation marks omitted).  The McDonnell Douglas burden-shifting
analysis used in claims of discrimination also applies to
retaliation claims under Title VII.  Reed v. A.W. Lawrence & Co.,
95 F.3d 1170, 1178 (2d Cir. 1996).

Even assuming that Plaintiff can carry his prima facie
burden based on the temporal proximity of his filing of an EEOC
charge (October 20, 2000) and his termination (November 17, 2000,
or January 25, 2001), see Quinn, 159 F.3d at 769, Plaintiff must
still prove that the Town's proffered non-discriminatory reasons
for his discharge were pretextual.  Treglia v. Town of Manlius,
313 F.3d 713, 721 (2d Cir. 2002).  As discussed above, based on
the series of threats and violent behavior exhibited by Plaintiff
in the months preceding his termination, and Plaintiff's refusal
to comply with the mandated conditions for his continued
employment, there is ample evidence to support the Town's reasons
for terminating Plaintiff.  The mere temporal proximity of his
firing to his filing of a discrimination charge in not enough, in

and of itself and under the circumstances, to support a finding
of pretext.  See Holtz v. Rockefeller & Co., 258 F.3d 62, 81 (2d
Cir. 2001).  Thus, we grant summary judgment in favor of the Town
on Plaintiff's retaliation claim set forth in Count II of the
complaint.

###  c.  Hostile Work Environment

Plaintiff's third Title VII claim is that he was subjected
to a hostile work environment because of his race.  In order to
survive summary judgment on a claim of hostile work environment
harassment, a plaintiff must produce evidence that "the workplace
is permeated with discriminatory intimidation, ridicule, and
insult, that is sufficiently severe or pervasive to alter the
conditions of the victim's employment."  Cruz v. Coach Stores,
Inc., 202 F.3d 560, 570 (2d Cir. 2000) (citing Harris v. Forklift
Sys., Inc., 510 U.S. 17, 21 (1993)) (internal quotation marks
omitted).  Isolated instances of harassment ordinarily do not
rise to this level.  Kotcher v. Rosa & Sullivan Appliance Ctr.,
Inc., 957 F.2d 59, 62 (2d Cir. 1992).  Rather, the plaintiff must
demonstrate either that a single incident was extraordinarily
severe, or that a series of incidents were "sufficiently
continuous and concerted" to have altered the conditions of his
working environment.  Perry v. Ethan Allen, Inc., 115 F.3d 143,
149 (2d Cir. 1997) (internal quotation marks and citations
omitted).  Determining whether workplace harassment was severe or

pervasive enough to be actionable depends on the totality of the circumstances.  Cruz, 202 F.3d at 570.  The Supreme Court in Harris instructed that a court should look to all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. 510 U.S. at 23.  The hostile environment must be both subjectively and objectively offensive:  one that a reasonable person would find hostile or abusive, and that the victim did, in fact, perceive to be so.  Id. at 21-22.

Additionally, Plaintiff must show that a specific basis exists for imputing the conduct that created the hostile environment to the employer.  Perry v. Ethan Allen, 115 F.3d at 149; Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir. 1995).  A plaintiff pursuing a hostile environment claim must establish a basis, rooted in common-law agency principles, on which to hold an employer liable for the acts of its employees.  Meritor Savings Bank FSB v. Vinson, 477 U.S. 37, 57 (1986).  The Second Circuit has held that employer liability for a hostile work environment created by co-workers attaches only when the employer has "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."  Murray, 57 F.3d at 249 (citing Kotcher, 957 F.2d at 63);

35

see also Quinn, 159 F.3d at 767; Perry v. Ethan Allen, 115 F.3d
at 149; Torres v. Pisano, 116 F.3d 625, 634 (2d Cir. 1997).

The Town asserts that Plaintiff has failed to set forth an
actionable hostile work environment claim for two reasons.
First, pointing to the fact that most of the racial comments of
which Plaintiff complains were made in the early to mid-1980's,
the Town argues that the alleged conduct was not sufficiently
severe or pervasive to create an objectively hostile or abusive
work environment.  Second, the Town claims that there is no basis
for imputing liability to the Town, since none of the alleged
comments were made by his superior officers and, as to the one
remark made by a fellow firefighter during the last ten years
(the Talbot remark), Plaintiff never filed a complaint with the
Town regarding this incident.  (Town's Mem. at 27-28.)

Plaintiff, on the other hand, alleges that from the first
day he worked for the Manchester Fire Department, he was
subjected to harassment because of his race.  He was the first
black hired and was subjected to "comments and innuendos from the
firemen." (Pl.'s Dep. at 15.)  The first thing he remembers is a
joke made by his retired Chief on his arrival at the station in
1983 about "being in the fire and them asking me to smile because
they couldn't see me in the smoke." (Id. at 15-16.)  About a
week later, a firefighter made a joke about a line gun.  He said
it was a "nigger stick.  It shoots an arrow with a rope attached

to it because they run so fast you can't chase them.  You put them in the back with this and pull them back with a rope."  (Id. at 16-17.)  Plaintiff testified that he could not recall any other comments when he was first hired but he testified that it was "pretty much daily jokes and innuendo.  It was constant." (Id. at 17.)  The offensiveness of these comments is beyond cavil.  However, these comments were made in the early 1980's, more than 15 years before the charge of discrimination that led to the filing of this lawsuit.[11]

Plaintiff also relates an incident in approximately 1988 when three of his fellow firefighters told him to "keep [his] mouth shut in the TV room or they would go up to Chief's office and tell him that they couldn't work with this n-----."  (Pl.'s Dep. at 26-27.)  Plaintiff made a written complaint concerning that incident to Deputy Chief McKay.  After an investigation, his charge was dismissed.  (Id. at 27-28.)  This was Plaintiff's

---

[11]  We recognize that hostile work environment claims are different in kind that discrete acts, since "[t]heir very nature involves repeated conduct." National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002).  "Such claims are based on the cumulative effect of individual acts." Id.  "It does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period [300 days]." Id. at 117.  While we have considered all of Plaintiff's evidence of hostile work environment, even that relating to events in the early 1980's, the fact that many of the incidents occurred more than 15 years earlier is relevant to the weight to be given this evidence and whether these incidents were part of the same actionable hostile work environment practice.  See 42 U.S.C. § 2000e-5(e)(1); National Railroad Passenger Corp., 536 U.S. at 120.

first complaint about harassment and his only complaint filed
with the Town prior to 1995.  (Id. at 28.)

In 1989, he filed his first complaint of discrimination with
the CCHRO primarily concerning Deputy Chief Beckwith who,
Plaintiff states, always had a complaint about Plaintiff's work.
(Id. at 17-18.)  Beckwith, however, according to Plaintiff, never
made any comments that were racially motivated (id. at 18), and
after Plaintiff filed his CCHRO complaint, the harassment by
Beckwith stopped for the most part.  (Id.)

Plaintiff also cites to the incident with Tsokalas in 1994
when he called Plaintiff a racist over a comment Plaintiff made
about whites in connection with something they heard on
television.  That comment, made by a co-worker, was six years
prior to Plaintiff's filing his charge of discrimination.

Finally, there was the altercation between Plaintiff and
firefighter Talbot, when Plaintiff accused Talbot of making a
derogatory racial comment about Plaintiff several years earlier,
which Talbot denied.  This is the only specific racial comment
that was directed toward Plaintiff within the last five years of
his employment with the Town.

In very general terms, Plaintiff testified that the
discrimination that he faced was "ongoing, but . . . at times it
wasn't an issue. . . . It was ongoing, but it wasn't something
that was a constant.  Happened on occasion."  (Pl.'s Dep. at

179.)  These vague statements of discrimination happening "on occasion" are not sufficient to create a triable issue as to whether Plaintiff was subjected to a racially hostile work environment that is actionable under Title VII.  Indeed, despite Plaintiff's claims of continuing harassment, he has produced evidence of only a few sporadic, racially derogatory remarks, which are too isolated to constitute collectively a hostile work environment.

Plaintiff also states that he was singled out for discipline, such as for using profanity that he describes as "part of the culture of the firehouse and was not unique to Plaintiff," whereas other white firefighters were not.  (Id. at 173.)  As discussed above, Plaintiff has failed to cite to any evidence in support of this claim, other than the comments involving firefighter Fusco (which were investigated and determined to have been a joke).

Moreover, Plaintiff has failed to show that the discipline that was taken against him was either racially motivated and was so pervasive as to alter the terms and conditions of his work environment.  In fact, in his brief in opposition to the Town's Motion for Summary Judgment, Plaintiff blames his verbal confrontations with other firefighters on his work related stress syndrome, which subjected him to disciplinary actions. (Pl.'s Mem. at 18.)

> When Plaintiff was placed under stress, he
> could verbally respond to the stress, and
> this verbal response to indignation and
> discrimination meant that his personnel file
> would almost prohibit his advancement within
> the Fire Department, and his personnel
> records would also be in a position to be
> utilized against him in both advancement and
> continued employment.  Defendants were all
> aware that Plaintiff has Work Related Stress
> Disorder.  Defendants also knew or should
> have known, specifically what types of events
> on the job, were likely to trigger
> Plaintiff's Work Related Stress Disorder.

Plaintiff also claims that Assistant Chief Bycholski failed to review his complaints of discrimination in an attempt to resolve them.  Plaintiff alleges that Bycholski failed to change the internal customs, practices and policies that led up to these complaints of discrimination.  This alleged failure to review complaints and to change practices and procedures does not establish harassment so "severe or pervasive" as to "alter the conditions of [his] employment and create an abusive working environment," Meritor Savings Bank, 477 U.S. at 67, so as to be constitute actionable under Title VII.

Therefore, although there is evidence that Plaintiff was subjected to offensive, racially derogatory remarks in the 19080's, early in his career as a firefighter, these incidents are too remote to support an actionable hostile work environment claim.  The remaining incidents are too isolated and sporadic to have created a subjectively and objectively hostile work environment.  See Perry v. Ethan Allen, 115 F.3d at 149.  We

40

grant summary judgment in favor of the Town on Count III of Plaintiff's complaint.

### 3.  42 U.S.C. § 1983 - Violation of Plaintiff's Civil Rights Against Individual Town Defendants and Town

In Count Four, Plaintiff alleges that the Town Defendants discriminated against him on account of his race in violation of his right to equal protection, as guaranteed by the Fourteenth Amendment.[12]  Section 1983 provides a right of action against any person, acting under color of State law, deprives another person of a right, privilege or immunity secured by the Constitution or federal laws.  42 U.S.C. § 1983.  Section 1983 does not create substantive rights.  It provides a means to redress the deprivation of a federal right guaranteed elsewhere.

With respect to claims against the Town, in Monell v. Department of Social Services, 436 U.S. 658, 691 (1978), the Supreme Court held that a local government cannot be held liable under § 1983 on a theory of respondeat superior for the actions of its agents or employees.  Rather, before a municipal entity may be found liable, the plaintiff must show that the municipality is "actually responsible" for his injuries, as through a "policy or custom" of the town.  Mandell v. County of

---

[12]  Although Plaintiff's complaint alleges a violation of Plaintiff's right to equal protection, he argues in his memorandum in opposition to the motion for summary judgment that his right to due process was violated.  Compare Pl.'s Compl. ¶ 71 with Pl.'s Mem. at 16.

Suffolk, 316 F.3d 368, 385 (2d Cir. 2003).  Here, the only
"policies or customs" Plaintiff has alleged are the Town's
repeated denials of his grievances and his discrimination
complaint, and the "code of silence" within the Fire Department,
which caused firefighters to "believe that their inequitable,
unjust, and discriminatory actions would never be scrutinized."
(Pl.'s Mem. at 18.)  Plaintiff states in conclusory fashion that
the "Town had customs, rules, regulations, policies and usage of
such long standing as to have the force of law."  (Id.)

    The mere fact that some of Plaintiff's grievances were
denied (while others were not) does not establish a policy and
custom.  There has been no other evidence of any "code of
silence" or any other policy or custom that would support a
Monell claim against the Town.

    With respect to Plaintiff's § 1983 claims against the
individual Town Defendants, Werbner, Weber, and Bycholski, in
their official capacities, the doctrine of qualified immunity
protects them from § 1983 claims unless their actions violated
clearly established constitutional or statutory rights and that a
reasonable official in the same position would have known that
his actions violated those clearly established rights.  Harlow v.
Fitzgerald, 457 U.S. 800, 818 (1982).  Given Plaintiff's history
of disciplinary actions, altercations with other firefighters,
and threats of violence to other firefighters prior to his

termination, it was objectively reasonable for the individual Defendants to believe that they were not violating a clearly established right of Plaintiff in terminating Plaintiff. <u>See Clark</u>, 218 F.3d at 919.

With respect to Plaintiff's claims against the Defendants in their individual capacities, although Plaintiff alleges that he was treated differently than "similarly situated white male counterparts," (Pl.'s Compl. ¶ 79), as discussed above, he has failed to provide evidence of other white firefighters who were similarly situated and who were treated differently.  This is fatal to his Equal Protection claim.  To state a prima facie claim under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must demonstrate that (1) he is otherwise similarly situated to members of the unprotected class;  (2) he was treated differently from members of the unprotected class; and (3) the defendant acted with discriminatory intent.  <u>See Johnson v. City of Fort Wayne</u>, 91 F.3d 922, 944-45 (7th Cir. 1996).

Although not pled in his complaint, Plaintiff for the first time alleges in his opposition papers to the motion for summary judgment that Defendants violated Plaintiff's due process rights when they denied him continued employment.  (Pl.'s Mem. at 16.) Whether his claim is for a denial of substantive due process or procedural due process is not stated.  Plaintiff states only that

43

"[t]he plaintiff is a municipal employee and has a property right protected by the Fourteenth Amendment in his continued employment.  The Plaintiff, Mr. Diggs has been deprived of a property right in that he was denied his continued employment." (Id.)  At this stage of the litigation, the mere claim of a due process violation in a memorandum in opposition to a summary judgment motion will not create a new cause of action under § 1983 nor will it defeat summary judgment.

Therefore, the Town Defendants are granted summary judgment as to Count Four of Plaintiff's Complaint.

### 4.   42 U.S.C. § 1985 – Conspiracy to Violate Plaintiff's Civil Rights Against Individual Town Defendants and Town

Section 1985 provides a private rights of action against any person who conspires to interfere with another's civil rights. The elements are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws; and (3) an act in furtherance of the conspiracy; (iv) whereby a person is deprived of any right of a citizen of the United States.  Brown v. City of Oneota, 221 F.3d 329, 341 (2d Cir. 2000).  Defendants assert their entitlement to summary judgment on the same grounds as set forth above with respect to Plaintiff's § 1983 claim.  Plaintiff has not opposed their motion on this claim.

A review of the record reveals no evidence that would support a conspiracy claim under § 1985.  For that reason and the

44

reasons discussed above, summary judgment is granted in favor of the Town Defendants on Count Five, Plaintiff's § 1985 claim.

### 5.  Disability Discrimination Claims Against Town

In Count Six, Plaintiff alleges that Defendants discriminated against him and retaliated against him because of his disability, in violation of the ADA.[13]  Under both the ADA and the Rehabilitation Act, Plaintiff must show that he is "disabled," as that term is defined by the Acts.  A "disability" is defined as (1) a physical or mental impairment that substantially limits one or more of the major life activities; (2) a record of such an impairment; or (3) being regarded as having such an impairment.  Plaintiff relies on the "regarded as" prong of the definition (42 U.S.C. § 12102(2); 29 U.S.C. § 705(20); see Pl.'s Dep. at 146), arguing that Defendants regarded him as having a mental disability that prevented him from performing the essential functions of his job.  He cites to the fact that he was required to undergo a fitness for duty evaluation.

To qualify as a disability, the relevant impairment must be

---

[13]  The ADA, like Title VII, requires a plaintiff to first file a charge of discrimination with the EEOC or state or local agency.  Exhaustion of administrative remedies is a prerequisite to suit under the ADA.  Jacques v. DiMarzio, Inc., 216 F. Supp. 2d 139, 143-44 (E.D.N.Y. 2002); Joseph v. Am. Works, Inc., No. 01 Civ. 8287, 2002 WL 1033833, at *5 (S.D.N.Y.  May 21, 2002).  The only charge of discrimination filed by Plaintiff that references a disability is the amended charge filed in December, 2000.

of a nature that "substantially limits one or more of the major

life activities."  42 U.S.C. § 12102(2)(A).  "Working" is among

those activities.   29 C.F.R. § 1630(i).  Where, as here, the

activity is "working," the EEOC regulations provide:

> The term substantially limits means
> significantly restricted in the ability to
> perform either a class of jobs or a broad
> range of jobs in various classes as compared
> to the average person having comparable
> training, skills and abilities.   The
> inability to perform a single, particular job
> does not constitute a substantial limitation
> in the major life activity of working.

29 C.F.R. § 1630.2(j)(3); see Sutton v. United Air Lines, Inc.,

527 U.S. 471, 491 (1999).  The Supreme Court has held that "[t]o

be substantially limited in the major life activity of working .

. ., one must be precluded from more than one type of job, a

specialized job, or a particular job of choice."  Sutton, 527

U.S. at 492; see Giordano v. City of New York, 274 F.3d 740, 747-

48 (2d Cir. 2001).

    Plaintiff asserts that he was disabled because his employer

perceived him as having a mental disability that prevented him

from performing his job.  An employer's request for a mental

evaluation, however, does not equate to regarding the employee as

substantially impaired in the major life activity of working.

See Cody v. Cigna Healthcare of St. Louis, Inc., 139 F.3d 595,

599 (8th Cir. 1998); Giordano, 274 F.3d at 749-50; Colwell v.

Suffolk County Police Dep't, 158 F.3d 635, 646-47 (2d Cir. 1998),

cert. denied, 526 U.S. 1018 (1999).  And, it certainly does not
mean that the Town regarded him as unable to perform a broad
range of jobs compared to the average person having comparable
skills, training and abilities.  Giordano, 274 F.3d at 749.  At
most, the evidence showed that the Town and some of Plaintiff's
officers were concerned about his ability to perform as a
firefighter given the stressful nature of the job.  That concern
does not equate to their regarding him as unable to perform a
wide range of jobs.    Therefore, Plaintiff has filed to establish
that he was "regarded as" disabled so as to fall within the
protections of the ADA and the Rehabilitation Act.

### 6.  Negligent and Intentional Infliction of Emotional Distress Claims Against Individual Town Defendants and Town

#### a.  Town's Governmental Immunity

In Counts Seven and Eight, Plaintiff has asserted claims for
intentional and negligent infliction of emotional distress.  The
Town of Manchester is immune from liability for damages caused by
the willful misconduct of its employees.  See Conn. Gen. Stat. §
52-557n; see Gordon v. Bridgeport Housing Authority, 208 Conn.
161 (1988).  Likewise, the Town is immune from liability for
negligence unless a statute has abrogated that immunity.
Williams v. City of New Haven, 243 Conn. 763, 766-67 (1998).
Plaintiff has cited no statutory authority that would abrogate
this governmental immunity.  Therefore, we find that the Town is
entitled to governmental immunity on Plaintiff's claims in Counts

Seven and Eight.

### b.  Individual Defendants

Plaintiff has also asserted these common-law claims against the individual Town Defendants, Chief Weber, Assistant Chief Bycholski, and Town General Manager Werbner.  With respect to Plaintiff's claim of intentional infliction of emotional distress by these Defendants, Plaintiff has alleged no acts by any of these individuals that could support such a claim.  See Carrol v. Allstate Insur. Co., 262 Conn. 433, 442 (2002).  "Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society." Petyan v. Ellis, 200 Conn. 243, 254 n.5 (1986) (quoting W. Prosser & W. Keeton, Torts § 12, p. 60 (5th ed. 1984)). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!" Carrol, 262 Conn. at 443 (citing 1 Restatement (Second), Torts § 46, cmt. (d), p. 73 (1965)).

Here, Plaintiff asserts in the most general terms that Defendants' conduct was "extreme and outrageous" because they

48

breached their duty to Plaintiff when they failed to maintain a work environment safe and free from harassment, retaliation, and discrimination.  Additionally, Plaintiff asserts that the breach of this duty caused Plaintiff's work-related stress disorder and that Defendants acted in reckless disregard of Plaintiff's civil rights.  (Pl.'s Mem. at 21.)  None of these claims, even when construed in the light most favorable to Plaintiff, rises to the level of conduct so extreme and outrageous as to support a common-law tort claim for intentional infliction of emotional distress.  Therefore, Count Seven will be dismissed as to the individual Town Defendants.

_____Plaintiff has also asserted a claim for negligent infliction of emotional distress.  The following four elements are necessary to prove a claim for negligent infliction of emotional distress: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.  Carrol, 262 Conn. at 444.  This claim, like the previous claim for intentional infliction of emotional distress, relies on the Town Defendants' failure to adequately represent Plaintiff and their alleged conspiracy with the Town.  There is nothing in the record that would support Plaintiff's claim that

these individuals engaged in "unreasonable conduct" that would support a claim of negligent infliction of emotional distress or that the conduct of a particular Defendant was the cause of Plaintiff's severe emotional distress.  See Monterey v. Southern New England Telephone Co., 175 Conn. 337, 345 (1978). Accordingly, the Court grants summary judgment in favor of the individual Town Defendants on Count Eight of Plaintiff's Complaint.

## B.  Claims Against Union Defendants

### 1.  Title VII Claims Against the Union Defendants

In Counts One, Two, and Three, Plaintiff claims that Local 1579 and its President, David M. Mayer, engaged in race discrimination, retaliation, and created a hostile work environment in violation of Title VII.  We have already dismissed these claims against Mayer.

It is undisputed that Plaintiff never filed a charge of discrimination against the Union.  A Title VII claimant may bring suit in federal court only if he has filed a timely complaint with the EEOC and obtained a right-to-sue letter.  42 U.S.C. § 2000e-5(e) and (f); Belgrave v. Pena, 254 F.3d 384, 386 (2d Cir. 2001); Shah v. N.Y. State Dep't of Civil Servs., 168 F.3d 610, 613 (2d Cir. 1999); Malarkey v. Texaco, Inc., 983 F.2d 1204, 1208 (2d Cir. 1993); Lee v. ITT Standard, 268 F. Supp. 2d 315, 335 (W.D.N.Y. 2002).  Exhaustion of administrative remedies

through the EEOC is "an essential element" of the Title VII
statutory scheme and, as such, is a precondition to bringing such
claim in federal court.  <u>Francis v. City of New York</u>, 235 F.3d
763, 768 (2d Cir. 2000).  The purpose of this exhaustion
requirement is to provide notice to the defendant and to
encourage conciliation and voluntary compliance.  <u>See</u> <u>Butts v.
City of New York Dep't of Hous. Preservation & Dev.</u>, 990 F.2d
1397, 1401 (2d Cir. 1993); <u>Snell v. Suffolk Cty.</u>, 782 F.2d 1094,
1101 (2d Cir. 1986).  Because it is undisputed that Plaintiff
never filed a charge of discrimination against the Union,
Plaintiff's Claims in Counts One, Two, and Three against the
Union are dismissed.

## 2.  Civil Rights Violations by the Union Defendants

In Count Four, Plaintiff alleges that the Union Defendants
discriminated against him on account of his race in violation of
his right to equal protection, as guaranteed by 42 U.S.C. § 1983.
"Because the United States Constitution regulates only the
Government, not private parties, a litigant claiming that his
constitutional rights have been violated must first establish
that the challenged conduct constitutes 'state action.' " <u>United
States v. Int'l Brotherhood of Teamsters, Chauffeurs,
Warehousemen & Helpers of Am.</u>, 941 F.2d 1292, 1295-96 (2d Cir.
1991) (citing <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1002 (1982)).  In
order to state a claim under § 1983, a plaintiff must allege that

he was injured by either a state actor or a private party acting under color of state law.  Parratt v. Taylor, 451 U.S. 527, 535 (1981) (overruled on other grounds by Daniels v. Williams, 474 U.S. 327 (1986)); Ciambriello v. County of Nassau, 292 F.3d 307, 324 (2d Cir. 2002); Spear v. Town of West Hartford, 954 F.2d 63, 68 (2d Cir. 1992).

Neither Local 1579 nor its President, David Mayer, were agents of the Town of Manchester, nor were they acting under color of state law at any time relevant to the claims in Plaintiff's complaint.  Plaintiff alleges no facts to the contrary.  For this reason, the Union Defendants are entitled to summary judgment on Count Four of Plaintiff's Complaint.

### 3.  The Union Defendants' Conspiracy to Violate Plaintiff's Constitutional Rights

Plaintiff has also asserted a claim under 42 U.S.C. § 1985 against Local 1579 and its President, David Mayer, alleging that they conspired with the Town to prevent Plaintiff from exercising his right to equal protection of the laws through the continual denial of grievances, denial of employment compensation, and failure to adequately advocate for Plaintiff.  These conclusory allegations of conspiracy are insufficient to state a cause of action against the Union Defendants under § 1985.  In Powell v. Workmen's Compensation Bd., 327 F.2d 131, 137 (2d Cir. 1964), the Second Circuit dismissed a complaint invoking this same section, holding that

> [a] complaint in a case like this must set
> forth facts showing some intentional and
> purposeful deprivation of constitutional
> rights. Snowden v. Hughes, 321 U.S. 1
> (1944). This complaint does contain some
> general allegations, framed in broad language
> closely paralleling that used in Sections
> 1983 and 1985(3), that defendants
> successfully conspired to deprive plaintiff
> of his rights. But plaintiff was bound to do
> more than merely state vague and
> conclusionary allegations respecting the
> existence of a conspiracy. It was incumbent
> upon him to allege with at least some degree
> of particularity overt acts which defendants
> engaged in which were reasonably related to
> the promotion of the claimed conspiracy.

Here, Plaintiff has failed to provide evidence of any overt acts

by the Union Defendants in furtherance of an alleged conspiracy

to deprive Plaintiff of his constitutional rights.

Additionally, a claim under section 1983 requires proof of

discriminatory animus. Brown v. City of Oneota, 221 F.3d 329,

341 (2d Cir. 2000). Plaintiff has neither alleged nor produced

evidence that the Union or its President exhibited a racially

discriminatory animus toward Plaintiff.

Therefore, Count Five of Plaintiff's complaint is dismissed

as to the Union Defendants.

### 4. Plaintiff's Claims of Disability Discrimination Under Title I of the ADA and § 504 of the Rehabilitation Act

As discussed above, both the ADA and Rehabilitation Act

prohibit discrimination against individuals with a perceived

disability. Under Title I of the ADA, covered entities include

labor organizations. 42 U.S.C. § 12111(2). There is nothing in

the record that would support a claim of disability discrimination by the Union Defendants.  Indeed, Plaintiff alleges no facts concerning either the Local or its President David Mayer engaging in any activity that adversely affected his employment because they perceived Plaintiff to be disabled. There simply are no facts in the record to support a claim of disability discrimination by the Union against Plaintiff.

Therefore, the Union Defendants are entitled to summary judgment on Count Six.

### 5.  Negligent and Intentional Infliction of Emotional Distress Claims Against the Union Defendants

With respect to Plaintiff's claim of intentional infliction of emotional distress by the Union Defendants, Plaintiff has alleged no acts by either of these Defendants that could support such a claim.  See Carrol, 262 Conn. 433.  In order for Plaintiff to prove a claim of intentional infliction of emotional distress, four elements must be established.  It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct;  (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress;  and (4) that the emotional distress sustained by the plaintiff was severe.  Petyan,, 200 Conn. at 253.  As discussed above, "[l]iability for intentional infliction of emotional distress requires conduct that exceeds all bounds

54

usually tolerated by decent society." Id. at 254 n.5 (quoting W. Prosser & W. Keeton, Torts § 12, p. 60 (5th ed. 1984)).

Here, Plaintiff argues that the conduct of the Union Defendants was extreme and outrageous in that, on certain occasions, they breached their duty to advocate for Plaintiff and then they acted "systematically for the common objective of the Town." (Pl.'s Mem. at 12.)  Plaintiff claims that this breach of duty caused Plaintiff's work-related stress disorder.  Plaintiff further states that Defendants acted with reckless indifference to Plaintiff's civil rights.  (Id.)  These acts, even when construed most favorably to Plaintiff, do not rise to the level of conduct so extreme and outrageous as to support the common-law tort of intentional infliction of emotional distress.  Therefore, Count Seven will be dismissed as to the Union Defendants.

Plaintiff has also asserted a claim for negligent infliction of emotional distress.  The following four elements are necessary to prove a claim for negligent infliction of emotional distress: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.  Carrol, 262 Conn. at 444.  This claim, like the previous claim for intentional infliction of emotional distress,

relies on the Union Defendants' failure to adequately represent Plaintiff and their alleged conspiracy with the Town.  In <u>Zrella v. Local 1303-26</u>, No. CV010508213S, 2003 WL 21267127 (Conn. Super. Ct. May 1, 2003), the Court granted summary judgment in favor of the Union where the plaintiff's negligent infliction of emotional distress count was premised on a breach of the duty of fair representation.  Likewise, Plaintiff's allegations against the Union Defendants in this case do not rise to the level of "unreasonable conduct" that would support a claim of negligent infliction of emotional distress.  <u>See</u> <u>Montenery v. Southern New England Telephone Co.</u>, 175 Conn. 337, 345 (1978).  Accordingly, the Court grants summary judgment in favor of the Union Defendants on Count Eight of Plaintiff's Complaint.

## Conclusion

For the reasons set forth above, the Defendants' Motions for Summary Judgment are granted as to all counts of Plaintiff's Complaint.  The Clerk is directed to enter judgment accordingly.

SO ORDERED.

Date: February 13, 2004.
     Waterbury, Connecticut.


_____/s/_____
GERARD L. GOETTEL,
United States District Judge